David M Morgan, Publisher
<u>The Cochise County Record</u>
10 Quality Hill
PO Box 1218
Bisbee Arizona 85603
<u>editor.SVDR@gmail.com</u>
520 236-4051

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| DAVID M MORGAN,<br><br> Plaintiff,<br><br>vs<br><br>BRIAN McINTYRE,  COCHISE COUNTY,  COCHISE COUNTY BOARD OF SUPERVISORS, SARA RANSOM, LORI ZUC-CO, MARK DANNELS, KEN BRADSHAW, ARIEL MONGE, TODD BORQUEZ, CAROL CA-PAS, MARY ELLEN SUAREZ-DUNLAP, AMY HUNLEY, JANE and/or JOHN DOES, PAT CALL, ANN ENGLISH, and PEGGY JUDD.<br><br><u>Defendants.</u> | Case No. 4:19-cv-00571-DCB<br><br><br>PLAINTIFF'S RESPONSE TO DEFENDANTS' 12(B)(6) MOTION TO DISMISS ALL COUNTY DEFENDANTS<br><br><br><br>THE HON. DAVID C BURY |

1    The County Defendants argue that:

2

3    (III.A) the Plaintiff's claims aren't sufficiently detailed, and

4

5    (III.B) that some of the defendants (the prosecutors) have ab-

6    solute immunity from liability, and

1                                    1

1    (III.C) that all of the defendants, in their individual capacities

2    enjoy qualified immunity, and

3

4    (III.D) that Plaintiff has not alleged sufficient facts to establish

5    County liability under *Monell,* and that, and that *respondeat*

6    *superior* claims are not available to him, and

7

8    (III.E) that the County, the Board of Supervisors and the indi-

9    vidual Supervisors are not proper parties because they have

10    no "control" over county employees in the offices of other

11    elected county officials (for this argument, the Sheriff and the

12    County Attorney), and

13

14    (III.F) that Plaintiff fails to make a sufficiently clear claim of any

15    conspiracy, and

16

17    (III.G) that Plaintiff failed to make a timely Notice of Claim on

18    the appropriate parties which precludes liability under state

19    law.

20

21    Plaintiff responds as follows:

22

23    **General Theory and Background**

24    Plaintiff's general theory is that current and ongoing corruption

25    and abuses of official power in Cochise County are wide-

26    spread and deep, ingrained after generations, and directly tied

1   to the historic and current lack of serious independent locally-
2   focused news operations.
3
4   The results are patterns and practices via generally unwritten
5   official policies that permit many levels of local government ac-
6   tors to unlawfully control timely access to public information.
7
8   The reasons for hiding or distorting public information range
9   from the petty (eg. to restrict public knowledge of the cost of
10  an addition to one's residence or the inability to pay one's bills
11  timely) to far more serious (eg. to avoid detection of criminal
12  activity and possible prosecution).
13
14  The corruption is both the cause and result of extremely limit-
15  ed public knowledge of local government affairs. The prob-
16  lems exist at every level and in nearly every local government
17  organization – in the Board of Supervisors, the Sheriff's Office,
18  the County Attorney's Office, and the Superior and Justice
19  courts but also at the school boards and sanitary districts and
20  fire districts.
21
22  The local government supervisors (small "s") and the County
23  Board of Supervisors are a significant part of the problem be-
24  cause they refuse to supervise. It would be politically and so-
25  cially uncomfortable for them to actually supervise – they
26  might well come under scrutiny themselves.  And, they may
27  well have been given bad advice by the County Attorney's

1   Office and others with regards to their responsibilities and au-
2   thorities.
3
4   A confined argument about availability of current information
5   to a particular citizen or small group in one narrow instance
6   usually doesn't challenge the fundamental local "traditional"
7   views about the importance (and value and power) of restrict-
8   ing public access to "government information".
9
10   But very public battles about a completely new approach to
11   public information availability and examination of past prac-
12   tices and the reasons for them can raise concerns among
13   those who have enjoyed the benefits of limited public access
14   to information, or expect to enjoy them.
15
16   In some instances, those persons may be in a position to, and
17   choose to, retaliate against persons or groups that they be-
18   lieve have exposed them, may expose them, and/or may suc-
19   cessfully challenge their long-held views about public informa-
20   tion availability.
21
22   Cronyism, nepotism, malfeasance, misfeasance, open meet-
23   ing law violations, run-of-the mill errors and silliness by local
24   government employees are subjects and events that "every-
25   body knows" about. But not really. Few people know the de-
26   tails, almost none have seen the documentation.
27

1

1   And drug-dealing, gun-running, human smuggling, domestic
2   violence, sexual abuse by local officials and/or their family
3   members and in "prominent families" in Cochise County - what
4   news organization would look into such matters and report on
5   them?
6
7   The business model for traditional small community local news
8   operations depends primarily on government advertising (offi-
9   cial notices) and local businesses.  Such local publishers are
10  not likely to "bite the hand that feeds them" AND the targets of
11  news investigations and resulting public scrutiny and criticism
12  frequently become less accessible, less forthcoming with infor-
13  mation – even public information.
14
15  When Plaintiff began challenging local government agencies
16  (including via court actions) AND publishing such stories AND
17  disseminating public documents AND and developed an audi-
18  ence large enough to be a possible political influence, some
19  people took notice, as losing control of information that might
20  affect their power and/or reputation was unthinkable.
21
22  Like attitudes about racial integration, simply knowing that
23  laws exist making certain actions unlawful doesn't change an
24  individual's mind from thinking that "it just doesn't feel right"
25  and "it's not fair that they're changing the rules."
26

1

1   When generations of Cochise County citizens – including

2   those currently in positions of authority – think they've learned

3   how the game works (including the perks of power like hiding

4   and manipulating information) – and then get confronted with

5   the actual rules and laws they, understandably, resist.

6

7   The examples cited in Plaintiff's complaint are but a tiny frac-

8   tion of the First Amendment violations which occur daily in

9   Cochise County because most local citizens (and the leader-

10  ship they select) don't really appreciate Arizona Public

11  Records law and the First Amendment. They didn't grow up

12  with an understanding of the relationship between strong local

13  independent media and good government. They grew up in

14  Cochise County where there's been a severe shortage of

15  both.

16

17  The following answers and additional information may be help-

18  ful to the defendants and the Court in understanding Plaintiff's

19  claims.

20

21  **With regards to Defendants' arguments in III.A**

22

23  **Suarez-Dunlap, Hunley and unknown employees of**

24  **the Office of the Clerk of the Superior Court for Cochise**

25  **County**

26

1   Until she was essentially removed from office by action of the

2   Arizona Supreme Court, Plaintiff and Defendant Suarez-Dun-

3   lap argued for 6-8 years about access to court information.

4

5   The arguments were about the law as well as about the

6   Clerk's lack of clear written policies, procedures, practices and

7   priorities – all as would relate to public access to court data

8   and documents. The innumerable arguments were in person

9   and by e-mail. Arguments also occurred between Plaintiff and

10  top supervisory staff of the Clerk's Office. Confrontations with

11  nearly all members of the Clerk's staff was common.

12

13  Plaintiff reported on events and published numerous stories

14  that in some manner or another identified problems and impli-

15  cated specific persons in the Office of the Clerk of the Superi-

16  or Court for Cochise County and the local courts.

17

18  Plaintiff attempted research on older court cases as well (e.g.

19  lawsuits by Sheriff's deputies against the county, wrongful ter-

20  mination actions, citizens suing local municipalities) and often

21  published such as "historical tidbits".

22

23  Plaintiff regularly stumbled across the mention of  "old" cases

24  in archived news articles published **outside** of Cochise Coun-

25  ty, for example:

26

1)  The criminal charges against Judge Joe Borane (who now "holds court" most morning's at the McDonald's in Douglas):

> A lawsuit filed against Judge Borane in January asserts that he turned the local jail into a debtors' prison, repeatedly jailing poor laborers who were unable to settle debts with local property owners.

> 'As a judge, he saw himself as a law unto himself," said John R. Evans, the Arizona assistant attorney general, who is coordinating the prosecution. . . .

> With a high school education, Mr. Borane rose from Douglas town patrolman and police chief to magistrate, justice of the peace and power broker, prosecutors and his former associates said.

> A prolific fund-raiser for the Democratic Party, he built a statewide reputation, serving for a decade on an elite panel that reviews the conduct of Arizona judges.

> Along the way, he bought nearly 200 houses, ranches and businesses that made him the county's largest landowner, with assets he declared in February 1999 at $5.9 million, according to county property records. County officials said his real estate assets were worth far more than that declared value.

> https://www.nytimes.com/2000/01/30/us/small-town-arizona-judge-amasses-fortune-and-indictment.html

2)  The unlawful activities of the Chief of Police of the Town of Huachuca City (who died recently but held his position for 30+ years):

> A former deputy with the Cochise County Sheriff's Department, Halloran was at loose ends in the summer of 1992, so he began volunteering as an undercover detective for the Huachuca City Police Department. Before long, Huachuca City Police Chief Dennis Grey teamed Halloran with another volunteer officer, Michael Rutherford, and the two became the tiny town's "special investigations unit."

1   Months later, Halloran's work paid off: The town received $88,000
2   for Halloran's work assisting a federal case. A few weeks later,
3   hoping to pull in at least a half-million dollars a year through simi-
4   lar investigations, Grey signed a contract with Halloran, agreeing
5   to pay him $50,000 annually as long as there were funds available
6   from forfeitures.
7
8   Halloran went right to work, spending thousands of dollars on
9   meals, hotels and plane tickets while uncovering cases in Tucson,
10  Phoenix and even California.
11
12  Don Watola, an investigator with the Arizona Attorney General's
13  Office, noted in a report:
14
15  "The propriety of these investigations outside of the jurisdictional
16  boundaries of Huachuca City lead one to believe that no other mo-
17  tivation existed other than to generate seizures and as a result,
18  funding. As one federal law enforcement official termed it, 'collars
19  for dollars.'
20
21  The majority of those investigations occurring outside of the
22  Huachuca City Police Department venue could have been better
23  served if conducted by another agency. Convictions of those arrest-
24  ed are few, especially in those cases where HCPD was the primary
25  investigative agency. Those actions conflict with the basic tenants
26  of our system, prompting one newspaper article which probably
27  accurately describes the actions as 'bounty hunting.' "
28  https://www.tucsonweekly.com/tw/03-07-96/curr2.htm

29  3)  The unlawful activities of the Assistant Police Chief of Bis-

30  bee (a now fully-retired city employee with 27 years service):

31  Bisbee Deputy Police Chief Ed Holly has resigned in the wake of
32  an investigation that uncovered a long list of violations that include
33  harassment, misuse of police equipment and lying to his superiors
34  and investigators.

35  City officials were set to fire Holly, 58, but he resigned during a
36  meeting this week with Bisbee officials where he could have
37  pleaded his case, said City Manager Stephen Pauken. Holly had
38  been with the Bisbee Police Department for 27 years, he said.

39  Violations found during the Cochise County Sheriff's Office in-
40  vestigation include:

1       • Holly used his Bisbee police vehicle to take his girlfriend to
2       and from Tucson and Phoenix airports on separate occasions.
3       He told his boss that she was a confidential informant who
4       needed protection.

5       • He harassed, threatened and ran an unauthorized background
6       check on a man he thought was interested in his girlfriend.

7       • On several occasions, Holly directed on-duty Bisbee police
8       employees to take him to and from the houses of different wom-
9       en he was dating.

10      • He continued using his city-issued cell phone during a five-
11      month period when he was on medical leave.

12      • Holly lied not only to his bosses but also to a Cochise County
13      sheriff's investigator about his actions.

14      The city does not plan to pursue civil or criminal charges
15      against Holly for any of his actions, Pauken said. https://tuc-
16      son.com/news/local/border/bisbee-s-no-cop-quits-accused-
17      of-host-of-violations/article_46f367d9-d677-5bcd-9202-
18      7336d638a15f.html

19      In 2017 and early 2018 (before Suarez-Dunlap was mysteri-
20      ously relieved of most duties without a recall vote or any public
21      notice), Plaintiff was regularly inquiring about exceptionally
22      high employee turnover rates in the 30-person office, rumors
23      of financial mismanagement and audit/reporting problems,
24      persistent data input errors, and improper file and document
25      access restrictions.

26

27      The Clerk of the Superior Court was already aware that Plain-
28      tiff sought a copy of a November 2014 "exit letter" sent by for-
29      mer Chief Deputy Clerk Billy Cloud to court staff, the Presiding
30      Judge, county management, and others, which harshly criti-

1    cized Suarez-Dunlap's official and personal conduct.  Plaintiff

2    requested employee records of key personnel of the Clerk's

3    Office, some of whom abruptly left the county's employ.

4

5    In mid-2017, access to public court data and case files be-

6    came even more problematic and unpredictable. Documents

7    and case files that were neither statutorily "non-public" nor

8    sealed by specific court order became routinely unavailable.

9

10   Plaintiff alleges that but for his many years of journalistic in-

11   quiries, reporting and publishing activities and his growing

12   readership and resulting potential political influence, Suarez-

13   Dunlap would not have made information access so difficult,

14   nor allowed the conditions to persist, nor have made those de-

15   cisions, taken those actions and directed and/or conspired

16   with county employees in the manners she did.

17

18   Suarez-Dunlap and supervisory-level county employees in the

19   Clerk's Office developed and implemented, or continued and

20   approved of, policies, practices and procedures which were

21   designed to unlawfully inhibit access to public information by

22   Plaintiff and others.

23

24   Suarez-Dunlap and one or more other county employees in

25   the Clerk's Office took those actions, or purposely avoided

26   corrective actions, in order to avoid public embarrassment (or

1

1   worse consequence) and to retaliate against Plaintiff for his in-
2   quiries, challenges, complaints, reporting and publishing.
3
4   Plaintiff asserts that testimony of current and former county
5   employees of the Clerk's Office, along with other evidence to
6   be obtained via this Court's discovery process and by inde-
7   pendent investigation, will enable Plaintiff to prove his allega-
8   tions of constitutional violations by the former Clerk and coun-
9   ty employees in that office.
10
11  Likewise, Amy Hunley the current Clerk of the Superior Court
12  for Cochise County, fails and/or refuses to correct policies,
13  practices and procedures of her predecessors which unlawful-
14  ly inhibit access to public information. *To wit,* Hunley fails to
15  develop and implement written procedures for Clerk's Office
16  employees despite knowledge of Suarez-Dunlap's failings and
17  the clear written advice by Doug Kooi, the *de facto* Clerk in-
18  stalled in 2018 by the Arizona Supreme Court in a situation so
19  severe that it quietly replaced Suarez-Dunlap before her elect-
20  ed term ended.
21
22  Plaintiff asserts that testimony of current and former county
23  employees of the Clerk's Office, along with other evidence to
24  be obtained via this court's discovery process and by indepen-
25  dent investigation, will enable Plaintiff to prove his allegations
26  of constitutional violations by the current Clerk (Defendant
27  Amy Hunley) and county employees in that office.
28

1

1    **McIntyre, Zucco and Ransom**

2    **of the Office of the Cochise County Attorney, and**

3    **Borquez of the Cochise County Sheriff's Office**

4

5    Plaintiff and County Attorney McIntyre have openly disagreed

6    for several years over improprieties and abuses in local grand

7    jury processes. In October 2014, then Deputy County Attorney

8    McIntyre arranged for a search warrant in hopes of examining

9    all of Plaintiff's communications with then foreperson of the

10   Cochise County grand jury, Craig Smith.

11

12   Plaintiff and Smith had regularly discussed the authorities and

13   responsibilities of Arizona county grand juries as a completely

14   independent investigative body – not under the direction nor

15   control of the County Attorney nor the courts.

16

17   A criminal investigation of Plaintiff and Smith was initiated by

18   the Cochise County Sheriff's Office evidently on suspicion of

19   "grand jury tampering". Google declined to provide all of the

20   information sought under the search warrant requested by

21   McIntyre. Indignant that he was subject to investigation, Smith

22   resigned from the grand jury. The results of the investigation

23   and/or subsequent legal analysis are unknown to Plaintiff ex-

24   cept that no criminal charges were filed against Plaintiff nor

25   Smith.

26

1      Over the course of more than a decade, Plaintiff wrote and/or

2      published hundreds of local court stories. Many cast prosecu-

3      tors and law enforcement officers in a "bad light", having point-

4      ed out errors, and shortcomings and misconduct.

5

6      In at least one story (2014, the prosecution and murder trials

7      of Agelina Roth-Lewis), Plaintiff reported McIntyre's miscon-

8      duct at trial – making improper remarks to the jury related to

9      the defendant's choice to remain silent - which resulted in new

10     proceedings, delayed justice and an estimated cost to the

11     county of $250,000 in additional expense.

12

13     Plaintiff published information about his inability to arrange for

14     the donation to the county of a $500 law book, "Prosecutorial

15     Misconduct" by Bennett Gershman. The University of Arizona

16     Law School Library had provided it to Plaintiff with the under-

17     standing that it would be made available to the public via the

18     Cochise County Public Law Library. Plaintiff reported that Pre-

19     siding Judge James Conlogue – in his capacity as head of the

20     statutorily created County Law Library Committee (which had

21     no other members and no known meetings for a decade) had

22     rejected the private contribution. Plaintiff donated the book to

23     the Copper Queen (City of Bisbee) library.

24

25     Plaintiff published one or more stories about the firing of

26     Deputy Public Defender David Thorn related to his relationship

27     with Prosecutor Lori Zucco.  Thorn is now an elected Superior

1       Court judge in Cochise County.  Zucco, now his wife, is
2       Cochise County's Chief Deputy Attorney, Criminal Division –
3       reporting directly to McIntyre.
4
5       In late 2017, Plaintiff published a story about claimed bungling
6       of Cochise County grand jury proceedings in a murder case
7       which could result in quashed indictments, delays and new
8       proceedings.  To explain the errors and the arguments by the
9       defense attorney, Plaintiff published a link to the complete offi-
10      cial transcript of the subject grand jury proceedings.
11
12      Lori Zucco made the grand jury presentation.
13
14      An investigation was initiated by request of the County Attor-
15      ney's Office to determine how Plaintiff obtained the transcript
16      and if any law had been broken.  Zucco, prosecutor in the un-
17      derlying criminal case, participated in the transcript investiga-
18      tion. Detective Todd Borquez of the Cochise County Sheriff's
19      Office was the lead investigator for the underlying case as
20      well.
21
22      The Office of the Cochise County Attorney then initiated a *civil*
23      action – not a criminal prosecution - against Plaintiff for injunc-
24      tive relief and damages. The authority for that action is un-
25      clear.  There is no public record of the Board of Supervisors'
26      awareness or approval. Deputy County Attorney Sara Ran-
27      som, who reported to both McIntyre and Zucco, argued that

1    Plaintiff had broken the law.  McIntyre said his office had spent
2    more than 100 hours on the case.  McIntyre testified that he
3    could have had Plaintiff arrested but chose another approach.
4
5    The stated objectives of the civil included to require Plaintiff to
6    *unpublish* the document and to prevent Plaintiff from publish-
7    ing similar documents and/or grand jury "information" in the fu-
8    ture.

9    No crime was charged, no probable cause was established. In
10   a hearing on the County Attorney's requested injunctive relief,
11   an out-of-county judge found that the Plaintiff had broken no
12   law in acquiring or publishing the document. The questions
13   were clearly First Amendment issues and the court declined to
14   grant a request for prior restraint.
15
16   Sara Ransom, for The Office of the County Attorney, appealed
17   and lost. Shortly thereafter, Ransom left county employ.
18
19   In February 2020, six months after the Arizona Court of
20   Appeals issued its mandate affirming the lower court ruling,
21   the County Attorney moved to dismiss the civil case against
22   the Plaintiff.
23
24   Plaintiff alleges that but for his many years of journalistic in-
25   quiries, reporting and publishing activities the County Attorney
26   for Cochise County, Brian McIntyre, and his deputies Zucco
27   and Ransom would not have chosen the precise set of actions

1

1   they took. They knowingly retaliated against Plaintiff.  The in-
2   tent was to punish Plaintiff and discourage future journalistic
3   inquiries, reporting and publishing activities by Plaintiff and
4   others.
5
6   Plaintiff asserts that testimony of current and former county
7   employees of the County Attorney's Office, along with other
8   evidence to be obtained via this court's discovery process and
9   by independent investigation, will enable Plaintiff to prove his
10  allegations of constitutional violations by Cochise County At-
11  torney McIntyre and Deputy County Attorneys Zucco and Ran-
12  som.
13
14  **Sheriff Mark Dannels, and Cochise County Sheriff's Office**
15  **staff Ken Bradshaw, Carol Capas, Ariel Monge, Todd**
16  **Borquez**
17
18  Over the course of 15 years, Plaintiff has authored and/or pub-
19  lished hundreds of local news articles, documents and com-
20  mentary which might lead to public scrutiny and criticism of the
21  Cochise County Sheriff's Office and other local law enforce-
22  ment authorities.
23
24  Plaintiff published information and/or news articles about:
25
26      •   Former Sheriff Larry Dever's death due to drunk driving
27          in his county-issue vehicle, hundreds of miles from

1    Cochise County.  Plaintiff published an official death

2    scene photo that showed Dever, a well-known Mormon,

3    slumped over in the cab of the pick-up and photos of

4    liquor bottles in the cab and dozens of beer cans strewn

5    along the roadway. Plaintiff published the autopsy re-

6    sults. And, Plaintiff published official reports indicating

7    that the initial law enforcement officer at the scene re-

8    ported "no alcohol" involved despite clear evidence to

9    the contrary.

10

11    •   Misconduct by Sheriff's office employees including mon-

12        ey laundering, rape, a deputy's hiring of a hit man,

13        weapons mishandling, reckless driving, DUI, failure to

14        report and/or follow-up, drug use, drug smuggling in-

15        volvement in organized prostitution, falsification of docu-

16        ments

17

18    •   An investigation by the county manager and IT depart-

19        ment of on-duty misuse of county computer resources

20        (equipment and Internet connections) to access non-of-

21        ficial websites (including "adult entertainment" sites) by

22        numerous Sheriff's Office employees whom Dannels re-

23        fused to identify.

24

25    •   Dismissal of criminal charges against defendants due to

26        unreliable testimony and/or unlawful searches by

27        Cochise County Sheriff's deputies

1

2       •   Contributions totaling more than $25 million by Howard

3            Buffett (significant local landowner and son of billionaire

4            Warren Buffett) to local law enforcement projects and

5            the resulting questions of how that might affect priorities

6

7

8    Plaintiff acquired, by public records request, more than

9    1,000 pages of complaints by Cochise County jail inmates

10   about health care, nutrition, interference with communications,

11   physical and sexual abuse, harassment, and commissary ac-

12   counting problems.  The inmate complaints frequently identi-

13   fied Detentions Commander Ken Bradshaw and jail operations

14   manager Lt Ariel Monge as problematic as well as specific de-

15   tention officers.

16

17   Current and former inmates were regular sources of informa-

18   tion for Plaintiff's news gathering, reporting and publishing ac-

19   tivities.

20

21   When Plaintiff began publishing information about jail book-

22   ings and with monthly and annual totals the Sheriff's Office

23   stopped making publicly available the sequentially assigned

24   inmate booking numbers.

25

26   Plaintiff asked Sheriff's Office's Public Information Officer Car-

27   ol Capas on many, many occasions to explain reporting de-

28   lays and apparent missing or clearly bogus information in daily

1    reports.  Capas routinely answered with "technical difficulties"

2    or offered other incomplete and inconsistent explanations

3    without supporting documentation.

4

5    In September 2017, Plaintiff accompanied Rachel Kacenga to

6    the Cochise County jail at her request (and on her statement

7    to Plaintiff that a pre-trial detainee wanted to talk in-person to

8    Plaintiff about corruption in local law enforcement). At the jail,

9    Plaintiff identified himself to the female detention officer.

10

11    When refused entrance, Plaintiff did not argue, posed no

12    threat, and waited patiently in the jail's lobby for 30 minutes

13    while Kacenga evidently visited the inmate inside the jail.

14

15    A day or two later, Plaintiff received notification that the Sherif-

16    f's Office was suspending his ability to use the Securus inmate

17    video visitation system. Though Plaintiff requested (via e-mail

18    to Monge, Bradshaw and Dannels) a review of the decision to

19    restrict Plaintiff's communications with inmates, no response

20    of any type was received.

21

22    Kacenga told Plaintiff months later that when questioned

23    about his presence that day she had not told the complete

24    truth to the Sheriff's Office because she feared it might impact

25    her relationships with the jail and the court while she was try-

26    ing to obtain approval to offer "half-way house/rehab" services.

27

1    Plaintiff alleges that but for his many years of journalistic in-
2    quiries, reporting and publishing activities Dannels, Capas,
3    Bradshaw, Monge and Borquez would not have taken the ac-
4    tions that they did, individually or in concert with others.
5
6    Plaintiff asserts that testimony of current and former county
7    employees of the Sheriff's Office, along with other evidence
8    obtained via this court's discovery process and by indepen-
9    dent investigation, will enable Plaintiff to prove his allegations
10   of constitutional violations by Sheriff Dannels and CCSO staff
11   Capas, Bradshaw, Monge and Borquez.
12
13   **Cochise County, Cochise County Board of Supervisors,**
14   **and its elected Board Members Ann English, Pat Call,**
15   **Peggy Judd**
16
17   Plaintiff is personally acquainted with the current and immedi-
18   ate past Board Members as well as current County Adminis-
19   trator Ed Gilligan and previous administrators Jim Vlahovich
20   and Mike Ortega . The County and the Board have been
21   aware of Plaintiff's work for many years. The parties have con-
22   versed on a variety of subjects including that of problems of
23   access to public records.
24
25   Plaintiff regularly made the Board and county management
26   aware of his work and concerns by individualized e-mails
27   and/or electronic publishing of local news stories.

1

1

2    For more than a decade, in the course of his work, Plaintiff

3    has had occasion to attend formal meetings and informal work

4    sessions of the County Board of Supervisors.

5

6    At an August 2015 work session of the Board of Supervisors,

7    Britt Hanson (Civil Division Chief of the County Attorney's

8    Office) requested that the Board consider methods of dealing

9    with "greatly increased" volume of public records requests that

10   required coordination and review by his office. Among Han-

11   son's suggestions was to support changes in state law so as

12   support greatly increased fees from the current $0.25 to $0.50

13   per page to "actual costs" incurred by the government.

14

15   At that meeting, Plaintiff was identified as the person making

16   the most public records requests to the county so far that year.

17   (The County Attorney's Office reported that 65 public records

18   requests had been made with Plaintiff accounting for 12 of

19   those.)

20

21   The Board did not, at that time, support any changes to the

22   fees for public records.

23

24   At another county supervisors' work session a presentation by

25   Presiding Judge James Conlogue in 2013 about the newly im-

26   plemented and controversial "Early Resolution Court" (ERC) –

1  a "fast track" for criminal cases - quite evidently included a re-
2  quest that was not on the agenda.
3
4  Near the conclusion, board member Ann English said, "So,
5  Jim. You're asking us for a couple of hundred thousand dollars
6  for bonuses for your people?"
7
8  Plaintiff was present and indicated his surprise and alarm to
9  Deputy County Attorney Terry Bannon (later appointed Superi-
10  or Court judge *pro tem)* who advised the meeting participants
11  that it didn't appear such discussion or decisions were appro-
12  priate as the matter hadn't been properly agendized and no-
13  ticed to the public. (Two weeks later, the payments were ap-
14  proved.)
15
16  At a regular meeting of the Board, during discussion of an At-
17  torney General's admonishment to the County regarding poor
18  practices and Open Meeting Law violations, Board President
19  Pat Call asked Chief Deputy County Attorney (Civil Division)
20  Britt Hanson, "Is it true? Have we been doing this wrong all
21  this time?"
22
23  Hanson responded, "How long have I been advising the
24  Board, now? 16 years? You know, I've never lost a minute's
25  sleep over it."
26

1

1    It is uncertain at exactly what point "the County" - the county

2    manager and/or Board of Supervisors - became aware of

3    Plaintiff's 2017-2018 battles with the Sheriff, the Clerk of the

4    Superior Court and the County Attorney, or if they were con-

5    cerned about the underlying issues.  It is uncertain if any of

6    those parties made inquiries to determine if or how they could

7    or should get involved, or if any of the matters posed potential

8    risks to "the County".

9

10    Plaintiff alleges that the Cochise County Board of Supervisors

11    (at the time, Ann English, Pat Call and Peggy Judd) knew at

12    all times – for years - of repeated, flagrant violations of Ari-

13    zona Public Records laws and First Amendment violations by

14    county employees, officials and officers but knowingly "looked

15    the other way".

16

17    The Board knew the law. The Board knew of potential reme-

18    dies. The Board knew of the risks of harm to "the County" and

19    to citizens of Cochise County. The Board steadfastly failed

20    and refused to supervise.

21

22    Plaintiff asserts that testimony of current and former county

23    employees, officials and officers along with other evidence ob-

24    tained via this Court's discovery process and by independent

25    investigation, will enable Plaintiff to prove his allegations of

26    constitutional violations by the Cochise County Board of Su-

27    pervisors, by way of complicity, by way of implicit approval of

1    unwritten but official policies and procedures, and by failure to

2    train and supervise the county's employees, officials and offi-

3    cers.

4

5    **As to Defendants' arguments in III.B**

6    Absolute immunity for prosecutors may shield them from liabil-

7    ity for even gross misconduct if the actions alleged are related

8    to a *criminal* prosecution AND the actions are within the "tradi-

9    tional role" of a prosecutor.

10

11   Political actions and investigatory activities, even when per-

12   formed by persons employed as prosecutors, are not entitled

13   to absolute immunity.

14

15   If the stated actions are alleged to have been *not* solely for the

16   purpose of protecting legitimate government interests – if re-

17   taliation is alleged as *a* motivating factor – then Plaintiff should

18   be allowed to proceed in order to permit the court to learn

19   more.

20

21   **As to Defendants' arguments in III.C**

22   It is settled law that no government actor may retaliate against

23   citizens for exercising their right to criticize their governments,

24   nor purposefully intimidate citizens from exercising their rights

25   and government actors may not use their positions to unlaw-

26   fully conceal or purposely inhibit access to public information.

27

1    Qualified immunity is extended to  "all [officials] but the plainly

2    incompetent or those who knowingly violate the law".  Malley

3    v. Briggs, 475 335, 341(1986)

4

5    Qualified immunity applies only to government officials in civil

6    litigation, and does not protect the government itself from suits

7    arising from officials' actions.

8

9    **As to Defendants' arguments in III.D and III.E**

10   As is being argued at this time by a Plaintiff in another court in

11   this district (Yearick v. Maricopa County CV20-0545-PHX-S-

12   PL), Plaintiff in this action takes the position that Cochise

13   County is vicariously liable for the acts of the Sheriff and Sher-

14   iff's Office employees, the Clerk of the Superior Court and

15   Clerk's Office employees, the County Attorney and employees

16   of the County Attorney's Office.  All are county "employees,"

17   and a county is thus the responsible public entity for those offi-

18   cers.

19

20   That the County, and/or the Board, may have no direct or im-

21   mediate control over them does not mean the County is not vi-

22   cariously liable for their acts. The right of control is not rele-

23   vant; the official relationship between the employee and a

24   county is the key factor.

25

26   Decisions and actions of elected Cochise County officials as

27   well as all other county employees can put the County at risk.

1    The County Board of Supervisors has the authority and re-
2    sponsibility to manage those risks, to manage all litigation and
3    to settle all claims against the County.  The Arizona legislature
4    gave the County Board of Supervisors the responsibility to
5    "Supervise the official conduct of all county officers . . charged
6    with managing or disbursing public revenues"  (A.R.S. 11-251)
7    and the power of subpoena in order to learn more about situa-
8    tions that might put the county at risk. ("The board may, by its
9    chairman, issue subpoenas to compel attendance of any per-
10   son and the production of any records relating to the affairs of
11   the county for examination upon any matter within the board's
12   jurisdiction." A.R.S. 11-218)

13

14   (In the context of Plaintiff's complaint it's worth noting that for 20 years in
15   Arizona, county Boards of Supervisors have had statutory authority to
16   "establish a central records center for the preservation, storage and han-
17   dling of all records required by law to be kept by county officers and jus-
18   tices of the peace." (A.R.S. 11-251.03)

19

20   **As to Defendants' arguments in III.F**
21   The nature of the actions alleged by Plaintiff to have been tak-
22   en by the various Defendants are such that it would have been
23   impossible to accomplish without the active knowing participa-
24   tion of others.

25

1

1    Plaintiff asserts that testimony of current and former county

2    employees, officers and officials along with other evidence ob-

3    tained via this Court's discovery process and by independent

4    investigation, will enable Plaintiff to prove conspiracies to com-

5    mit the constitutional violations alleged.

6

7    **As to Defendants' arguments in III.G**

8    Plaintiff admits that he did not make any Notice of Claim on

9    any of the parties pursuant to A.R.S. 12-821.01

10

11   **Conclusion**

12   Numerous federal courts have concluded that a complaint

13   should not be dismissed for failure to state a claim unless it

14   appears beyond doubt that the plaintiff can prove no set of

15   facts in support of his claim which would entitle him to relief.

16

17   The County Defendants' Motion to Dismiss

18   should be DENIED.

19

20   RESPECTFULLY SUBMITTED this 6th day of July, 2020.

21

        BY    /s/ David M Morgan

Attachments:

A) Transcript of Hearing on Application for Temporary Re-
straining Order (Day One)
B) Transcript of Hearing on Application for Temporary Re-
straining Order (Day Two, including Findings, Conclusions)

1

C) Letter from Cochise County Sheriff's Office
D) Arizona Capitol Times article

## **CERTIFICATE OF SERVICE**

I, David M Morgan, hereby certify that on July 6, 2020:

I (1) electronically transmitted this document to the Clerk's Office using the CM/ECF System for Filing , and (2) sent a copy by email to the parties listed below:


James M Jellison, Esq
jim@jellisonlaw.com
judy@jellisonlaw.com
Attorney for "Cochise County Defendants" (Brian McIntyre, Cochise County, Cochise County Board of Supervisors, Sara Ransom, Lori Zucco, Mark Dannels, Ken Bradshaw, Ariel Monge, Todd Borquez, Carol Capas, Pat Call, Ann English and Peggy Judd)


Christopher P White
Christopher.White@azag.gov
Assistant Arizona Attorney General
Attorney for "State Defendants" (Mary Ellen Suarez-Dunlap and Amy Hunley)

1