IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF COCHISE

| | |
|---|---|
| OFFICE OF THE COCHISE COUNTY ATTORNEY, by and through Cochise County Attorney Brian McIntyre, a political subdivision of the State of Arizona,<br><br>               Plaintiff,<br><br>     vs.<br><br>DAVID MORGAN, an unmarried individual,<br><br>               Defendant. | CV 2017-00670 |

REPORTER'S TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

BEFORE:       The Honorable Thomas Fink, Division VII

APPEARANCES:    Sara Ransom
                Deputy County Attorney
                Representing the Plaintiff

                David Morgan
                in Propria Persona

Bisbee, Arizona
February 20, 2018
3:00 p.m.

I N D E X

<u>WITNESSES</u>:                                              <u>Page</u>

David Morgan

    Direct Examination by Ms. Ransom                    12

    (Cross) Self-Examination Statements by Mr. Morgan    58

    Redirect Examination by Ms. Ransom                   63

    Questioning by the Court                             72

```
 1                    P R O C E E D I N G S
 2
 3            THE COURT:  Good afternoon.  This is case number
 4    CV2017-670, Office of the Cochise County Attorney versus
 5    David Morgan.
 6            Could we begin by having the parties state their
 7    appearances, please.  Starting with the Plaintiff.
 8            MS. RANSOM:  Sara Ransom for the Cochise County
 9    Attorney's Office, Your Honor.  And with me is client
10    representative Brian McIntyre.
11            THE COURT:  Good afternoon.
12            MR. MCINTYRE:  Good afternoon, Your Honor.
13            MR. MORGAN:  David Morgan, sir.
14            THE COURT:  Good afternoon.  All right.  A
15    preliminary matter.  I understand there's a media request
16    from Mr. Morgan to record the proceedings, and there's an
17    opposition from the Plaintiff.
18            So Mr. Morgan, what is it -- how is it that --
19    what is it you plan -- would like to do?  What's the
20    request?  How would you like to do it?
21            MR. MORGAN:  Well, actually, it may not be
22    necessary at this moment, sir, because the person I was
23    anticipating, although she just tried to call me a couple of
24    minutes ago.  It says I'm at Superior Court.
25            So the person that I was -- am relying upon to do
```

1    this is apparently in the building somewhere.

2            THE COURT:  Well, assuming she gets here.  If

3    she's here, what is it that -- what is it that you're asking

4    to do?  What do you plan?

5            MR. MORGAN:  To take video of the proceedings of

6    witness testimony, um, the general proceedings.  She could

7    sit most anywhere.  It doesn't require special lighting or

8    electricity or anything.  Probably -- I'm not sure what

9    device she brought, but probably a simple iPhone or iPad or

10   something like that.  We have done this before, in this

11   courtroom in fact.  But.

12           THE COURT:  So you're just proposing that she use

13   an iPhone or some kind of --

14           MR. MORGAN:  Yeah.  It's not like an old-style TV

15    camera.

16           THE COURT:  All right.  And she would sit out in

17   the gallery someplace?

18           MR. MORGAN:  Well, Your Honor, we're -- candidly,

19   the jury box is usually a better vantage point for taking

20   the photos.

21           THE COURT:  Okay.  And the State has -- thank

22   you, sir -- the State has an objection?

23           MS. RANSOM:  Yes, Your Honor.  As stated in the

24   State's opposition, the concern is that recording these

25   proceedings will be used for further dissemination of the

1    protected materials, and if efforts are made by the

2    Defendant, which obviously the County would object to, but

3    if efforts were made by the Defendant to publicize them, he

4    can show them to his friend first, and then they'll have,

5    you know, Exhibit 25 of, look, we're not complying with

6    this, and thus we should be excused from our obligations.

7    That's my primary concern.

8           My other concern, Your Honor, and this has been

9    addressed in the cases like this KPNX case, and also touched

10   upon in the more recent Phoenix newspapers case from 2018.

11   But it's there is a matter of decorum and a concern about

12   interrupting the flow of these proceedings.  We really only

13   have two hours.  The State has a heavy burden it needs to

14   satisfy in the next two hours, and we would like to get to

15   the substance without distraction.

16          THE COURT:  All right.  Thank you.  The Court is

17   guided by Rules of Supreme Court of Arizona, Rule 122, use

18   of recording devices in the courtroom.  The subsection (d)

19   provides that a properly submitted request for coverage

20   should generally be approved, but a judge may deny or limit

21   the request as provided in this paragraph.  A judge's

22   decision on a coverage request, or an objection to coverage,

23   is reviewable only by special action.

24          Subsection (1) concerns grounds for denial of the

25   coverage.

1          Mr. Morgan, I'm gonna grant your request

2     consistent with Rule 122.  Your person cannot sit here in

3     the jury box.  They can sit in the gallery with the rest of

4     the public.

5          Also, I understand the State's concern concerning

6     any possible further dissemination of the matters that could

7     be subject to grand jury secrecy rules.  I think the Court

8     can fashion protective orders and respond as needed.

9     Obviously, it -- the Court will take such action and enter

10    such orders as are necessary to further prevent the unlawful

11    dissemination of grand jury materials.

12          So, in other words, for instance, just for

13    example, if any party, probably -- probably defendant, but

14    if any party seeks to introduce for instance the names or

15    identifying information of the individual grand jurors, the

16    Court will act to prevent that from being further

17    disseminated, whether it be in open court here or subject to

18    videotape.

19          So your person can -- can be in the courtroom, as

20    long as it's not -- as long as it's not something that's a

21    distraction to these proceedings.  She can sit in the -- he

22    or she can sit in the gallery of the court, and we'll deal

23    with any possible issues concerning the matters that are

24    occurring or arising before the grand jury, if and when they

25    come up.

```
 1              MR. MORGAN:  Thank you, Your Honor.  Do you
 2    prefer me sitting or standing?  The lady is in the Superior
 3    Court in Sierra Vista right now, so won't likely be arriving
 4    very quickly, and maybe not make it at all today.  But I
 5    would like to keep it open in case we -- in case she shows
 6    up or in case we end up continuing.
 7              THE COURT:  All right.  So if she shows up, let
 8    me know.  I obviously don't know who she is.  If she shows
 9    up, let us know so we can inform her of the ground rules.
10              MR. MORGAN:  Thank you.  I'm sorry.
11              THE COURT:  That's all right.  There's also a
12    motion to continue.  Do you want to be heard on that, Mr.
13    Morgan?
14              MR. MORGAN:  Yes.  Thank you very much.
15              I received the disclosure from the State on
16    Thursday afternoon, some of it right after five, some of it
17    earlier in the day, but I didn't have a chance to read any
18    of it 'til starting on Thursday evening, and of course then
19    the long weekend.  So it was very little time to -- well,
20    first I had to begin to understand what was going on in the
21    theory of the or the County's theory of the case, and then
22    do research on the case law, so I could figure out how I
23    would argue against those positions, and maybe find
24    witnesses that could assist me as well.
25              So that's essentially it, is that I haven't had
```

1    enough time since Thursday evening to -- to put together the

2    arguments.  Granted, if I understand the situation

3    correctly, that all we're here today to discuss is or this

4    phase is whether or not the extraordinary order of the Court

5    to invoke or to issue an order to stop or undo the

6    publishing is all that's to be considered at this time.

7    Maybe I don't need to worry about all the rest of that.  But

8    if part of that calculation is going to be based on whether

9    or not I committed any criminal act, either in the

10    acquisition --

11             THE COURT:  The only issue before the Court is

12    whether or not the State is entitled to the, let's call it

13    the injunctive relief, the State has requested.  This is a

14    civil proceeding.  It's not a criminal proceeding.

15             MR. MORGAN:  Right.

16             THE COURT:  I can't give you legal advice.

17             MR. MORGAN:  No, no, no.

18             THE COURT:  I can't -- I can't give you legal

19    advice.  I can advise you that -- that anything you say

20    here, you know, potentially can and could be used against

21    you in a criminal proceeding.  But the results of -- the

22    direct results of this proceeding, if any, would not be any

23    kind of finding that's -- that you have engaged in criminal

24    activity.  That's not the relief that the State is

25    requesting.  But that -- that indirect ramifications, if

1   any, of what happens in this proceeding is something that's
2   a different matter.

3          MR. MORGAN:  I believe I understand that, and
4   that's fine.

5          THE COURT:  All right.  Thank you.  The request
6   for a continuance is denied.  I've been reviewing the
7   State's pleadings.  I think the Defendant has had ample
8   time.  I don't find that there are discovery issues, and
9   discovery that would -- would prevent the Defendant from
10  being prepared for these proceedings.  So we'll go forward.

11         The request for a continuance is denied.  I see
12  no potential prejudice to the defense from going forward at
13  this time, based on the record before the Court.

14         All right.  Ms. Ransom, how would you like to
15  proceed?

16         MS. RANSOM:  Thank you, Your Honor.  A few more
17  hopefully quick preliminary matters to speed things along.
18  I would ask that the Court take judicial notice of the
19  proceedings in Cochise County Superior Court, State versus
20  Roger Wilson, CR 2017-516.  Since many matters are by order
21  under seal in that case and are pertinent to this
22  proceeding, we would ask that you take judicial notice, and
23  you are authorized to do so under in re: Sabino R. 198 Ariz.
24  424.  Appellate --

25         THE COURT:  So you're asking me to take judicial

1    notice of the public part of the file in CR 2017-516?

2           MS. RANSOM:  Yes, Your Honor.  And as necessary,

3    do an in camera review of the matters under seal to the

4    extent that they do bear upon your determination.

5           THE COURT:  Thank you.

6           Mr. Morgan, do you understand the request and do

7    you have a position?

8           MR. MORGAN:  I believe I understand the request,

9    and I don't -- I don't think I have any reason to object to

10   an in camera review of the items that are sealed, and the

11   rest of it's public anyways.

12          THE COURT:  Fair enough.  Pursuant to the State's

13   motion, there being no objection, the Court will take

14   judicial notice of the public record in CR 2017-516, from

15   Cochise County, this division, and I take it, and if

16   necessary the parties have no objection to the Court

17   reviewing in camera any sealed matters within that file.

18          MS. RANSOM:  And then finally the State has

19   brought 10 potential exhibits, which are marked.  We have --

20   I've provided copies to Mr. Morgan.  They are from the

21   State's disclosure documents previously provided to him.

22   We've exchanged some emails.  I wasn't certain if he would

23   stipulate to their admission or not, but the State has

24   offered for Mr. Morgan to stipulate to the exhibits.

25          My -- the only caveat being marked Exhibit Number

1    10, the State intends to use only for refreshing

2    recollection purposes, and does not wish to admit into

3    evidence.  I don't know if Mr. --

4            THE COURT:  So it sounds like, Mr. Morgan, again,

5    I'm not trying to influence your decision, but there's nine

6    potential exhibits, One through Nine, that the State intends

7    to offer for purposes of this hearing.  Just I guess it's

8    just an inquiry as to whether you're willing to stipulate to

9    their admission or not.  I guess 10 is just maybe used to

10   refresh recollection.

11           MR. MORGAN:  I have no objection.  I apologize to

12   the Court and to Attorney Ransom for not making clear that I

13   have no objection to those exhibits.

14           THE COURT:  All right.  So are you moving those

15   into -- are you moving those at this time?

16           MS. RANSOM:  Yes, Your Honor.  The State moves

17   One through Nine into evidence.

18           THE COURT:  Exhibit -- State's Exhibits One

19   through Nine, without objection from the defense, are

20   admitted.

21           And how would you like to proceed?

22           MS. RANSOM:  Does Your Honor -- would Your Honor

23   like brief openings or simply proceed to evidence?

24           THE COURT:  I think let's proceed to evidence,

25   and let's -- we'll do some closings, and the Court can

1    follow up with questions.

2              MS. RANSOM:  Certainly, Your Honor.  The State

3    calls David Morgan.  The County, excuse me.

4              THE COURT:  Mr. Morgan, step up please and be

5    sworn by the clerk of the court.

6              MR. MORGAN:  Will I need to bring any of the

7    exhibits with me?

8              MS. RANSOM:  I'll present them to you.

9              MR. MORGAN:  Thank you very much.

10             THE COURT:  Sir?

11             MR. MORGAN:  Sorry.

12             THE COURT:  Thank you.

13             (Whereupon the witness is sworn by the clerk.)

14             THE COURT:  State your name and spell your last

15   name for the record.

16             MR. MORGAN:  David Marshall Morgan, M-O-R-G-A-N.

17             THE COURT:  Whenever you're ready.

18

19                      DAVID MORGAN,

20   called as a witness herein, having been first duly sworn,

21   was examined and testified as follows:

22

23                   DIRECT EXAMINATION

24   BY MS. RANSOM:

25        Q.    Good afternoon, Mr. Morgan.  How are you?

```
 1        A.    I'm fine.  Thank you.
 2        Q.    You don't have to be specific, but where is your
 3   residence?
 4        A.    Across the street.  10 Quality Hill -- yes, 10
 5   Quality Hill in Bisbee.
 6        Q.    All right.
 7              THE COURT:  Could you maybe move that a little
 8   closer to you?
 9              THE WITNESS:  Yes.
10        Q.    BY MS. RANSOM:   Have you lived in Cochise County
11   for a number of years?
12        A.    Since, um, April Fool's Day, 2005.
13        Q.    All right.  And what do you do for a living?
14        A.    Um, it's a -- I'm a news guy, but it doesn't make
15   me a living.  It is not a profitable enterprise at this
16   time.
17        Q.    Okay.  And in the course of being a news guy,
18   what is it that you do to publish your news or disseminate
19   your news?
20        A.    Primarily by electronic means:  Email, websites,
21   Facebook.
22        Q.    And is the name of your publication The Cochise
23   County Record?
24        A.    That is correct.
25        Q.    Is that your website publication as opposed to
```

1     your Facebook publication?

2          A.     Yes.    The -- the distinction is that the website

3     is a more traditional news website.   We publish -- there's

4     no letters to the editor; there's no commenting on anything.

5               The Facebook is a news discussion group, and I

6     post some, maybe all now.   But at any rate, I post some of

7     the news stories that I write, some other people write, and

8     then many group members publish their own things.   I don't

9     have control over what they -- I mean I suppose I have

10    literal control, but I don't intend to prevent people from

11    publishing in the news discussion group.

12         Q.    What is the name of the Facebook news discussion

13    group?

14         A.    If I can remember.   Hold on.   It's Cochise County

15    Courts, Crime, Jail, Justice, and Politics.

16         Q.    And are you the moderator of that group?

17         A.    That's correct.

18         Q.    What does that mean?

19         A.    That I control who joins the group, who -- well,

20    I'm not sure, frankly, the distinction between administrator

21    and moderator.   But I, in fact, I'm the only authorized

22    person to control who joins the group, who gets kicked out,

23    if it happens, which it rarely does, what gets posted there,

24    what is -- what the rules are, et cetera.

25         Q.    And how about with the website, *The Cochise*

1     *County Record* website, are you in control of that website?

2     A.    Yes.

3     Q.    Do you control its content as well?

4     A.    Yes.

5     Q.    Are you the only contributor to *The Cochise*

6    *County Record* website at this time?

7     A.    At this time, yes.

8     Q.    Okay.  Who's previously contributed?

9     A.    I think that on the other -- in recent memory,

10    over the last couple of years is my recollection, the only

11    other reports I've published were by Terri Jo Neff, N-E-F-F.

12     Q.    All right.  And, in general, how do you obtain

13    the information that you publish on -- I'm gonna call your

14    website and Facebook discussion group collectively as the

15    website; is that okay?

16     A.    Fine.

17     Q.    All right.  How do you obtain the information

18    that you publish on the website?

19     A.    By attending court hearings, by reading case

20    files, interviewing people, reading police reports,

21    attending meetings.

22     Q.    When did you establish the website?

23     A.    This is the third or fourth iteration.  The first

24    one was quite a long time ago, 2006 or 7 or 8.  And, no, I

25    don't remember if there was one in 2006 for sure.

1       Q.    Okay.  And when did the Facebook discussion group

2  come up?

3       A.    Quite a bit later, maybe 2013 or 2014.  I'm

4  sorry.  I don't remember.

5       Q.    That's all right.  And do you have any training

6  in the law?

7       A.    No.

8       Q.    In the course of -- how long have you been

9  attending court proceedings here in Cochise County?

10      A.    Well, more regularly since I moved to Bisbee a

11  couple years ago, but quite a bit over 12, 13 years.

12      Q.    All right.  And when you say a couple years ago

13  you moved to Bisbee, how many years?

14      A.    Well, I was going back and forth between Sierra

15  Vista and Bisbee as often as I could, given the limitations

16  of time and public transportation.  But so I was visiting, I

17  mean attending court hearings in Bisbee beginning of 2008 or

18  9, but more regularly when I moved, I think in

19  January-February of 20 or 20 -- must've been 2015.  February

20  of 2015, I think.

21      Q.    About three years now?

22      A.    Maybe it's been three.  I was thinking it's been

23  two, but I'm not sure.

24      Q.    All right.  Do you know what a grand jury

25  proceeding is?

```
 1       A.    Yes.
 2       Q.    Do you know where grand jury proceedings are held
 3   in Cochise County?
 4       A.    Generally, yes.
 5       Q.    Do you know when they're held in Cochise County?
 6       A.    Yes.
 7       Q.    And when are they held?
 8       A.    Thursdays.
 9       Q.    Do you go attend those?
10       A.    No.
11       Q.    Why not?
12       A.    Um, the presentation to the grand jury and the
13   deliberations of course are -- are restricted access,
14   restricted to only those people who need to be there.
15       Q.    Have you ever tried to attend a grand jury
16   proceeding?
17       A.    No.
18       Q.    Okay.  When did you come to understand that grand
19   jury proceedings are restricted access?
20       A.    I don't recall.
21       Q.    Would it be more than three years ago?
22       A.    Yes.
23       Q.    Okay.  Have you ever spoken with grand jurors
24   while you've been at the courthouse?
25       A.    Um, no.  Well, excuse me, not that I was aware
```

1    of.

2        Q.    Okay.

3        A.    Not that I can recall.

4        Q.    Back in 2014, did you have some issues with the

5    County Attorney's Office as a result of some suspected

6    interactions with the grand jury foreperson?

7        A.    Yes.    They weren't just suspected, they were in

8    fact interactions with the grand jury foreperson.

9        Q.    So you were speaking with the grand jury

10   foreperson?

11       A.    Yes.

12       Q.    Were you exchanging written communications?

13       A.    And in person, yes.

14       Q.    Okay.

15             THE COURT:    What was the last part of the answer?

16             THE WITNESS:    Yes, in person and by email, yes.

17       Q.    BY MS. RANSOM:    Do you know what happened as a

18   result of the County Attorney's Office's discovery of your

19   interactions with the grand juror foreperson?

20       A.    Yes, or at least I know some of it.    I don't know

21   all of it.    I know that the county attorney, Deputy County

22   Attorney McIntyre, at the time, authorized it -- I'm doing

23   this from memory now.    I don't have those documents in front

24   of me -- authorized a subpoena to Google for my gmail

25   records.    That was declined by -- Google said they would not

1    provide it under the circumstances.

2          So then the sheriff's office, I think Detective

3    Judd, I don't know who obtained the search warrant, but

4    narrowed the request for information to emails between

5    myself and Craig Smith, who was the grand jury foreman at

6    the time.

7          Q.   What happened to the grand jury foreman after his

8    interactions with you?

9          A.   Um, well, of course I wasn't there, but it's my

10   understanding that he asked Presiding Judge Conlogue some

11   questions about the authorities and powers and

12   responsibilities of the grand jury, and I can't remember

13   what he explained to me about that, but or what I read about

14   that in Detective Judd's report.  I don't remember.

15         But at any rate, the -- then when Mr. Smith

16   determined that he was also being investigated for improper

17   communications, he got most uncomfortable and asked the

18   Judge some other kinds of questions, and I wasn't there, but

19   my recollection is he said something to the effect of -- I'm

20   sorry -- Judge Conlogue said something to the effect of do

21   you feel like you need to be excused from grand jury duty,

22   and Mr. Smith responded yes.

23         So whether or not he was -- I don't think he was

24   asked to discontinue his service, but he -- that was the

25   situation.  And so some weeks before the end of the term,

 1    the 120 days, I think the 1st of December, you know,

 2    timeframe, is when he was no longer on the grand jury.

 3        Q.    All right.  And so after your communications with

 4    the foreperson, he stepped off the grand jury?

 5        A.    Not like immediately I don't think, but, yes.

 6        Q.    Okay.  Do you know a man named Roger Wilson?

 7        A.    Yes.

 8        Q.    And how do you know Roger Wilson?

 9        A.    Um, I think I first came into contact with him

10    when he was in jail in 2012 and 2013.

11        Q.    Have you recently spoken with Roger Wilson?

12        A.    Yes.  Probably in the last -- I don't think it

13    was this morning, but I think in the last couple of three

14    days.

15        Q.    Okay.  In the approximate six years that you've

16    known him, do you consider him a friend?

17        A.    I've been quite friendly towards him.  I don't

18    know if we've ever even shared a meal together.  We have had

19    many, many, many communications.  He's a real interesting

20    fellow, and has had some interesting problems, and I -- this

21    is what I do is talk to people in the system, and that

22    includes inmates and defendants.

23        Q.    Have you -- do you admire Mr. Wilson?

24        A.    I admire some of his characteristics, yes.

25        Q.    And what about Mr. Wilson's character do you

1    admire?

2        A.    Um, I think he's quite forthright.  Um, he's

3    quite courageous.  Both of those qualities I think sometimes

4    cause him some problems, but I nonetheless admire this

5    quality.

6        Q.    Is Mr. Wilson in jail right now?

7        A.    Yes, from my understanding.  I went and saw him

8    this morning.

9        Q.    Is he facing a criminal charges?

10       A.    Yes.

11       Q.    What's he facing?

12       A.    I understand the new indictment.  I have not read

13   it yet, but it's my understanding he's facing first degree

14   murder, second degree murder, manslaughter, and possession

15   of weapons by a prohibited possessor.

16       Q.    You mentioned a new indictment.  Are you aware of

17   a prior indictment against Mr. Wilson?

18       A.    Yes.

19       Q.    Okay.  Do you know what was the -- what the

20   charges were in the prior indictment?

21       A.    I can't recite them.  They're very similar.

22       Q.    So are there new charges now in the new

23   indictment?

24       A.    I'm not sure.

25       Q.    Okay.  Do you know how the State obtained the

1    charges against Mr. Wilson?  Did they go to a preliminary

2    hearing, for example?

3         A.    Oh, to my knowledge, no.  The grand jury indicted

4    him, Mr. Wilson, both times.

5         Q.    Do you know when the grand jury originally

6    indicted Mr. Wilson?

7         A.    Couldn't tell you the date off the top of my

8    head, but it should have been June of 2017.

9         Q.    All right.  Did Mr. Wilson receive a

10   court-appointed attorney around that time?

11        A.    Yes.  I can't remember if -- probably there were

12   a series of them, if I remember the order for sure.

13        Q.    Did you speak with an attorney about Mr. Wilson's

14   case?

15        A.    Yes.

16        Q.    What was the name of the first court-appointed

17   attorney?

18        A.    I think it was David Wilkison, but right now I

19   just can't remember for sure.

20        Q.    David Wilkison?

21        A.    I believe so.

22        Q.    How did you communicate with Mr. Wilkison about

23   Mr. Wilkins' -- Wilson's case?

24        A.    Um, occasionally in person in the court here, in

25   the courtroom, sometimes by text message or cell phone

1  calls, and I presume also by emails.  I know some by email.

2      Q.    Did you ever give anything to Mr. Wilkison about

3  Roger Wilson's case?

4      A.    Now when you mean gave something, the answer's

5  probably yes, but I can't give you a specific example right

6  now.

7      Q.    All right.  Did you ever receive anything from

8  Mr. Wilkison related to Roger Wilson's case?

9      A.    Yes.

10      Q.    And what did you receive?

11      A.    Well, by email I received the grand jury

12  transcript, September 5th, I believe, of 2017.  And another

13  time, after a court appearance, Roger Wilson had handed

14  Mr. Wilkison an envelope full of paperwork, and I have yet

15  to determine or figure out which day that was when the

16  hearing was.  Obviously, it was while Mr. Wilkison was still

17  representing him.  And after the hearing Mr. Wilkison came

18  over to the corner of the courtroom downstairs and said,

19  here, Roger wants you to have this stuff.

20      Q.    What was the stuff that Mr. Wilkison handed you

21  the second time?

22      A.    I honestly don't remember.  It was a whole bunch

23  of stuff.  It was some, um, like greeting cards that he and

24  other prisoner, I mean inmates, have prepared.  There was

25  some court documents that I don't recall precisely what was

1    there, and there was some handwritten letters, and then a

2    complaint to the jail.  There was a sheet or two of paper

3    that was all torn up, and I had tried to put it back

4    together and I didn't know what that was for sure.

5        Q.    Now was that before or after Mr. Wilkison emailed

6    you the grand jury transcript that you got the stack of

7    papers.

8        A.    I can't say for sure.  I'm sorry.

9        Q.    That's all right.  The email that you received

10   with the grand jury transcript attached, was that the full

11   and complete copy of the grand jury transcript?

12       A.    To my understanding.

13       Q.    Okay.  What did you do with that grand jury

14   transcript?

15       A.    I printed it out.  Probably forwarded it.  I

16   can't remember.  But at any rate, I made sure that Roger

17   Wilson's mother got a copy.  Um, I think I shared a copy of

18   it with a reporter friend or two, um, by email that is.  And

19   then the printed copy I took to the post office the next day

20   and sent it by priority mail to Roger Wilson in the Santa

21   Cruz County Jail.

22       Q.    What is the name of Roger Wilson's mother?

23       A.    Jan Wilson.

24       Q.    So you forwarded her a copy of the grand jury

25   transcript?

1    A.    I'm doing this from memory, and I'm almost

2    certain that's accurate, but I didn't check it before today

3    to make sure.

4    Q.    All right.  And then you -- also, you believe you

5    emailed it to two reporters?

6    A.    One almost for certain for sure, and I suspect I

7    did to another as well.

8    Q.    What are the names of those individuals?

9    A.    Well, the one is Terri Jo Neff, and the other

10   one -- I don't remember for sure if I sent it to Chuck

11   Alton.  I really don't remember.  I'm sorry.

12   Q.    All right.  Did you ever post the grand jury

13   transcript on your *Cochise County Record* website?

14   A.    I'm not being devious.  I don't think I really

15   posted it on *Cochise County Record*.  Oh, I'm sorry.  If

16   you're talking about the website, including the Facebook

17   thing, then the answer is yes.  I didn't really put it on

18   cochisecountyrecord.com. website, as I recall.  I can't

19   remember.  But I -- I posted it with a news story about the

20   motion to remand, and put a link at the bottom of that, that

21   news story, to both the motion to remand and the grand jury

22   transcript and maybe another document too, the indictment.

23   I don't remember.

24   Q.    All right.  And let me back up.  You said you got

25   the grand jury transcript full and complete copy in early

1    September 2017?

2        A.    We can look at that for sure because I have the

3    copy that I tried to send to Mr. Wilson, but almost positive

4    it was September 5th.

5        Q.    All right.  And you'd mentioned --

6        A.    And one of your exhibits is Attorney Wilkison's

7    email to me.

8        Q.    And you'd mentioned that something about you did

9    a story on the motion for remand.  When was that filed?

10       A.    October -- you mean when did I post the story?

11       Q.    When was the motion for remand filed; was that

12   Friday, October 6th?

13       A.    Sounds right.  That was probably right, and then

14   I posted the story on Sunday.  I think it was the 8th.

15       Q.    All right.  How did you know the motion for

16   remand was being filed?

17       A.    I think I knew because I monitor lots of cases in

18   the clerk's system, and I knew that the due date was on that

19   particular day and it had not yet been filed.  Whether or

20   not I communicated with Attorney Wilkison to find out if he

21   was planning to file it on that day or not, I don't recall.

22   But as it happens, I was in the courthouse at the clerk's

23   office in the lobby when Wilkison came in to file it.

24       Q.    All right.  And did you obtain a copy of the

25   motion for remand when Mr. Wilkison filed it?

1      A.    Moments after.

2      Q.    And how did you obtain a copy of the motion for

3  remand?

4      A.    I paid -- paid the fees to the clerk.

5      Q.    All right.  So Mr. Wilkison didn't hand it to

6  you?

7      A.    No.  No, I recall asking him, because the clerk's

8  office charges 50 cents a page.  I had said how many pages

9  in the -- in the motion, and I can't recall if he broke it

10  down from then or not, but it was like 12 pages in the basic

11  motion, plus the exhibits.  And I said so how much total,

12  and he said 50, 60 pages.  And I didn't have enough money

13  with me, so I said I'll just get the basic motion for now

14  and figure out whether there's anything interesting in there

15  about which I would want to see the exhibits as well.

16      Q.    All right.  Why did you wait until October when

17  the motion for remand was filed to post the grand jury

18  transcript?

19      A.    Um, because the story was about the motion to

20  remand.

21      Q.    Then why did you need to post the grand jury

22  transcript?

23      A.    So that people who were reading it would

24  understand the arguments that the attorney was making.  He

25  was arguing that there were errors made in the grand jury

1    process and pointed out those errors, and so that was the

2    story.

3        Q.    And in addition to posting the grand jury

4    transcript, did you also post the exhibits that had been

5    presented to the grand jury?

6        A.    They were a part of the transcript, so yes.

7        Q.    Okay.  And what are those exhibits?  Could you

8    describe them for the Court?

9        A.    My recollection is just three.  Um, a hand-drawn,

10   by Roger Wilson, map on like a yellow pad or something.  He

11   was trying to describe the incident, location, scene, et

12   cetera.  And an aerial photo, appeared to be taken maybe by

13   a -- a drone of this area of the scene, not that night of

14   course, but a daytime photo of the area later.  And then a

15   photo of Mr. Arvizu on a hospital gurney, dead with a

16   shotgun wound in his side.

17       Q.    And what did the photograph of the victim

18   Mr. Arvizu add to your article about the motion for remand?

19       A.    First of all, it's a part of the document.

20       Q.    It -- was it a part of the motion for remand?

21       A.    Oh, motion for remand.

22       Q.    Your article is about the motion for remand,

23   right?

24       A.    The article is about the motion for remand,

25   that's correct.  But the lead-to the -- to the grand jury

1    document, it linked to the complete document.

2         Q.    And you chose to make it link to the complete

3    document --

4         A.    I'm sorry?

5         Q.    -- correct?  You chose to link the entire grand

6    jury transcript --

7         A.    I did.

8         Q.    -- to the document?

9         A.    That's correct.

10        Q.    Okay.  And you didn't have the exhibits for the

11   motion for remand, so you didn't know what the motion for

12   remand may have been referencing when it referenced exhibits

13   otherwise?

14        A.    I don't have the motion to look at for me to

15   refresh my memory, but I agree.  I did not have the exhibits

16   to the motion for remand on October 8th when I published

17   them.

18        Q.    Did your article discuss the photograph of the

19   deceased victim at all?

20        A.    Discuss it.  Well, no.  I don't even have that in

21   front of me to follow that.  Probably.  I think I said

22   that -- I think I described the image.  As a matter of fact,

23   I improperly described it at first.  I -- I think I said it

24   was an autopsy photo or a medical examiner's photo or

25   something, and then it was brought to my attention that that

1    was impossible, and that it was a police photo at the

2    hospital in Sierra Vista.  So I corrected the description of

3    the image, and may have discussed or speculated, I don't

4    remember, on why it was presented to the grand jury; why the

5    photo was presented to the grand jury and thus became a part

6    of the transcript.

7        Q.    You may have, but you're not sure as you sit here

8    today if you wrote about that?

9        A.    If we have copies of it and I could refresh my

10   memory quickly and tell you, but right now I don't remember.

11   It's been six months ago.

12       Q.    Did you reach out to the deceased individual's

13   family before you posted that photograph?

14       A.    No, I did not.

15       Q.    Why not?

16       A.    It's not my policy to ask subjects of stories

17   their permission.  Sometimes I need information from them in

18   order to verify things, but in this case I didn't find that

19   necessary.

20       Q.    There is a certain shock value to the posting

21   that you did of that photograph, is there not?

22       A.    It's a shocking photo.

23       Q.    And there it received a lot of comments as a

24   result of that photograph, did it not?

25       A.    Indeed it did.

1    Q.    And those comments were largely objections and

2    requests that you take the photograph down due to your --

3    due to the fact that you were upsetting the family, right?

4    A.    There were quite a number of people who were

5    upset, yes.

6    Q.    In fact, you received, what, more than 10

7    objections by members of the public?

8    A.    I don't recall, but I suspect it was lots more

9    than that.

10   Q.    Did anyone indicate to you that they thought it

11   was great that you had that photo up?

12   A.    I don't recall that.

13   Q.    Did you take it down out of respect for the

14   family?

15   A.    No.

16   Q.    Did you speak with Mr. McIntyre at any point

17   regarding your posting?

18   A.    There wasn't a phone conversation.  I don't

19   recall a personal conversation.  Mr. McIntyre sent me an

20   email said, I've become aware of the -- of the posting, and

21   I think it would be instructive for you to read this

22   statute -- and that statute I don't remember -- and that I

23   think you should take it down or something to that effect.

24   Q.    All right.  I'm placing State's Exhibit Two,

25   which has been admitted into evidence, in front of you.

1    Please take a look at the document and let me know if you

2    recognize it.

3        A.   Yes.

4        Q.   All right.  Is it fair to characterize this as a

5    seem -- email exchanges between yourself and Cochise County

6    Attorney Brian McIntyre from October 11th, 2017, through

7    October 26th, 2017?

8        A.   Appears to be, yes.

9        Q.   Do you believe this to be a complete set of

10   communications between yourself and Mr. McIntyre on the

11   subject of your posting on October 8th?

12       A.   I think so, yes.

13       Q.   All right.  Now the first email is from

14   Mr. McIntyre on Wednesday, October 11th, 2017.  I'm looking

15   at the page marked County 143, the bottom right side.

16       A.   Yes.

17       Q.   All right.  If you turn to the next page, County

18   144, Mr. McIntyre has provided you a variety of links for

19   information.  What did you understand those links to

20   contain?

21       A.   All three of them were statutes that he was -- I

22   want to say the right word -- recommending of the -- that he

23   thought might be instructive or helpful to me in determining

24   what I should do.

25       Q.   All right.  And what did you understand

1    Mr. McIntyre to be requesting that you do?

2        A.    Well, I was -- it was quite clear he wanted me to

3    take -- to remove the visual depiction of the victim, the

4    link to the grand jury transcript, and find ways not to make

5    those things public.

6        Q.    All right.

7        A.    Oh, and the -- and the list of grand juror names

8    that was a part of the grand jury transcript.

9        Q.    And why did Mr. McIntyre make that request of

10    you?

11        A.    Well, I presume he believes -- believed that

12    those -- my actions were in violations of these statutes,

13    and so he was suggesting that I stop violating them.

14        Q.    All right.  Did you read the statutes?

15        A.    I did.

16        Q.    All right.  Did you read them that day when you

17    received the email from Mr. McIntyre?

18        A.    Probably.  2:56 p.m.  Highly likely that I read

19    it yet that day or the evening, yes.

20        Q.    All right.  And then Mr. McIntyre also wrote to

21    you on October 12th.  If we look at County 142, I think

22    you'd responded you were gonna talk to an attorney about the

23    situation, something to that effect?

24        A.    Actually, where I used the word counsel, which I

25    didn't mean to be necessarily relating to an attorney.  But,

1    yes, I was seeking advice from other people.

2         Q.    All right.  And in response, Mr. McIntyre

3    directed you to some legal authority, correct?

4         A.    Yes.

5         Q.    Some case law?

6         A.    Yes.

7         Q.    Do you have the ability to access that case law?

8         A.    Yes.

9         Q.    Did you do so?

10        A.    I believe so.

11        Q.    And you read those cases?

12        A.    That's my recollection, yes.

13        Q.    Did you do it on or about October 12th, 2017,

14   after Mr. McIntyre alerted you to those?

15        A.    I'm sure within a day or two.  Maybe the same

16   day.  I don't remember for sure.

17        Q.    All right.  After October 12th, 2017, when you

18   posted the grand jury materials on the website -- and what

19   I'm gonna do is I'm gonna call them the protected materials.

20   And I'm referring to the grand jury transcript and exhibits,

21   the motion for remand itself and the attachments, and any

22   subsequent filings related to the motion for remand, okay?

23        A.    All right.

24        Q.    All right.  So after October 8th, did you ever

25   email the protected materials to anybody else?

1       A.    Yes.

2       Q.    Who did you email it to after October 8th?

3       A.    I'd have to look to be sure, but probably that

4  same day or the next day.  I don't know.  But my email list

5  is about 10,000 people who sent some kind of notice about

6  the story.  The story really wasn't about the grand jury

7  transcript.  That was a supporting document to the story.

8            So I sent the story or headlines and summaries

9  and a link to the story -- I'm not sure how I did it right

10  now -- but to everybody on my email list.

11       Q.    All right.  And you did that again after

12  October 8th?

13       A.    I don't remember if I did it.  Well, subsequent

14  to the initial time I sent out an email blast, there are

15  additional people that get added to the email list, or I

16  guess that would be the only way.  Be no reason for me to

17  send the same.  Usually there's no reason to say the -- send

18  the same thing twice to the same addresses, so I presumably

19  sent it to additional addresses.

20       Q.    All right.  Besides email, did you send the

21  protected materials in any other manner to third parties?

22       A.    Other than the copies that I sent to or attempted

23  to send or did send to Roger Wilson in jail, I don't believe

24  I sent copies to anybody else.

25       Q.    All right.  Putting State's Exhibit one.  It's

1    admitted.  Let me know if you recognize Exhibit One.

2        A.    Okay.  Yes.

3        Q.    Is this an email that you wrote, Exhibit One?

4        A.    Yes.

5        Q.    And this email I believe is dated December 14th,

6    2017?

7        A.    Yes.

8        Q.    Okay.

9              THE COURT:  I'm sorry.  What was the date again?

10             MS. RANSOM:  December 14th, 2017.

11       Q.    BY MS. RANSOM:   Did you draft the content of

12   Exhibit One?

13       A.    Yes.

14       Q.    All right.  And it goes from County One to Three,

15   so it's about a three-page email.

16             Did you email Exhibit One out to third parties?

17       A.    Not sure what you mean by third parties.  I

18   emailed Exhibit One to some number of parties.  My

19   recollection is not the entire email list of regular

20   readers, probably mostly to the legal community and the

21   media community.

22       Q.    All right.  And we can see, if you look on

23   Exhibit One, a variety of areas in your email that are blue.

24   Do you know why those are blue?

25       A.    Those are hyperlinks.

1       Q.    What's a hyperlink?

2       A.    You can take -- by clicking on any of those

3    links, it would take you to an associated page or site or

4    specific -- specific document.  Sometimes you can even set

5    it so it takes you to a specific spot in a specific

6    document.

7             MS. RANSOM:  All right.  Your Honor, for the

8    benefit of the Court, can I publish Exhibit One?

9             THE COURT:  Sure.

10            THE WITNESS:  Your Honor --

11      Q.    BY MS. RANSOM:  And so, for example --

12            THE WITNESS:  -- can I get my water?

13            THE COURT:  Sure.

14      Q.    BY MS. RANSOM:  So here where we've got the blue

15   motion for remand, is this a hyperlink to the full and

16   complete copy of the motion for remand that Mr. Wilkison had

17   filed on behalf of Mr. Wilson?

18      A.    Well, when you say full and complete -- what was

19   the date of this?  December 14.  I think I did.  Again, I

20   can't tell you for sure.  It certainly was a link to the

21   basic motion.  Whether or not at that time I had included

22   whatever exhibits were attached to whatever exhibits I might

23   have acquired, I don't think I ever got -- I just don't

24   remember.

25      Q.    All right.  And then down a little bit further,

1    next couple of paragraphs there's a blue link indicating the

2    full grand jury transcript?

3         A.    Yes.

4         Q.    If a person were to receive your email and click

5    on this blue link, what would it be route -- what would that

6    person be routed to?

7         A.    To the full grand jury transcript.

8         Q.    And we're talking about the Roger Wilson grand

9    jury transcript from June 2017?

10        A.    Yes.

11        Q.    Okay.  Including exhibits?

12        A.    Yes.

13        Q.    And you sent this email on December 14th, 2017?

14        A.    I did.

15        Q.    Okay.  Next exhibit that I wanted you to take a

16    look at is Exhibit Five, which is admitted into evidence.

17    And with the Court's permission, I'll publish it.

18          Take a look and let me know if you recognize that

19    document?

20        A.    Yes, I recognize it.

21        Q.    Is this another email that you wrote?

22        A.    Yes.

23        Q.    What's the date of this email?

24        A.    December 9, 2017.

25        Q.    All right.  What prompted you to write this

1  email?

2      A.    Um, basically a follow-up to the first story.  At

3  this point the County Attorney's Office had advised me that

4  they wanted me to stop publishing the -- the protective

5  materials as -- as they were described in -- oh, I guess

6  you -- sorry.  Your office filed, um, the verified complaint

7  on December 7.

8      Q.    Yes.

9      A.    And so the news item was that basically that this

10  new action had taken place, and so that's what I was

11  reporting on.

12     Q.    All right.  And your news item is -- when were

13  you served with the complaint?

14     A.    Probably on the 8th.

15     Q.    And then on the 9th, so the day after you're

16  served with the complaint, you've written this story about

17  what's been filed against you?

18     A.    Yes.  I remember now Deputy Watkins served me in

19  the lobby of the courthouse on Friday afternoon, and so I

20  read it, and Saturday sometime I -- it says 8:02 p.m.  So

21  Saturday sometime I began publishing the story, yes.

22     Q.    All right.  And if you look in the numbering in

23  the bottom right-hand corner at County 184, it's the third

24  page of Exhibit Five, there's a reference to the underlying

25  Wilson case documents?

1      A.    Yes.

2      Q.    This is part of your article that you'd just

3    written and published on December 9th, correct?

4      A.    Yes.

5      Q.    And what -- are these again hyperlinks to the

6    underlying Wilson case documents?

7      A.    Yes.

8      Q.    All right.  And so here you're linking again to

9    the motion for remand grand jury proceedings?

10     A.    Yes.

11     Q.    All right.  And you're linking to the full and

12   complete grand jury transcript again on December 9th?

13     A.    Yes.

14     Q.    And that includes the exhibits?

15     A.    I didn't alter the document in any way so -- or

16   at least not purposely.  So whatever pages were there, were

17   still there.

18     Q.    And then a transcript of an interview with Roger

19   Wilson?

20     A.    Yes.

21     Q.    Okay.  And the transcript of the interview with

22   Roger Wilson isn't the subject of our application that we're

23   dealing with today.

24     A.    I understand that, yes.

25     Q.    Okay.  And you -- did you send this email on

1    December 9th to third parties?

2       A.    Yes.  I can't tell from this how many people I

3    sent it to, but yes.

4       Q.    Do you have an estimate of how many people you

5    may have sent it to?

6       A.    I do not.  It was certainly hundreds.  I don't

7    believe -- given the formatting, I don't think this went to

8    my full list.  However, probably the same as there was

9    posted on Facebook, so it would have more distribution

10   there.

11      Q.    All right.  Did you file something with the Court

12   on February 5th, 2018?

13      A.    Yes.

14      Q.    Did you attach some items to that filing?

15      A.    Yes.

16      Q.    And those items -- do those items include the --

17   another copy of the motion for remand?

18      A.    That's my recollection, but without it in front

19   of me I couldn't say absolutely for sure.

20      Q.    All right.  I will -- it's marked, but not

21   admitted as --

22      A.    I recall it's number 10.

23      Q.    -- Exhibit 10.  And the State does not move to

24   admit it, due to the fact that it has the motion to remand

25   in it.  Do you want to refresh your recollection and let me

42

1   know if it's in there?

2              (Whereupon the witness is reviewing the

3   above-referenced Exhibit 10.)

4        A.    Yes.  The basic 12-page motion is there.

5        Q.    All right.  Do you know what happens to documents

6   that you file with the clerk of the court?

7        A.    I think so, yes.

8        Q.    Okay.  What happens when you file a document with

9   the clerk of the court?

10       A.    It gets stamped and it gets scanned into the

11  document storage retrieval system, and hard copies get

12  placed in the file.

13       Q.    Are they then accessible to the public?

14       A.    Almost always.

15       Q.    Okay.  At some point did you become aware of an

16  order of the court sealing the motion for remand?

17       A.    Yes.

18       Q.    And when did you become aware of that order?

19       A.    Sometime in October.

20       Q.    About October 26th?

21       A.    Sounds right.

22       Q.    Okay.  And the order didn't just seal the motion

23  for remand; what did it also seal?

24       A.    Do you have the order handy?

25       Q.    Sure.  If it -- would it refresh your

1    recollection?

2         A.    Yes.    Thank you.

3         Q.    Okay.    It's State's Exhibit Four.

4         A.    Yes.    It orders that the motion for remand,

5    exhibits to the motion for remand, the grand jury

6    transcript, and exhibits from the grand jury proceedings be

7    sealed by the clerk of the court.

8         Q.    Okay.    What is the date of that order?

9         A.    Six -- 16 October.

10        Q.    All right.    And to the best of your recollection,

11   when did you become aware of this order?

12        A.    Very -- maybe the same day, um, but very shortly

13   thereafter.

14        Q.    All right.    When you became aware of the order,

15   did you remove the postings from -- well, first off, when

16   you became aware of the order was the posting of the

17   protective material still available on your website?

18        A.    It was.

19        Q.    Okay.    Did you remove it from your website?

20        A.    No.

21        Q.    And why not?

22        A.    I don't believe the order directs me to remove

23   that.

24        Q.    All right.    When -- after you learned of the

25   order -- you learned of the order before you filed your

1    answer with the Court, correct?

2        A.    Yes.

3        Q.    But you nonetheless attached the motion to remand

4    to the answer?

5        A.    Yes.

6        Q.    What do you understand the order to prohibit?

7        A.    Actually, I don't understand the order to

8    prohibit -- well, I suppose it prohibits the clerk from

9    releasing it.

10       Q.    Okay.  What do you understand the intent of the

11   order to be?

12       A.    To keep the clerk from allowing the public to

13   have access to it.

14       Q.    And so when you file -- when you make filings and

15   attach something that's the subject of the order sealing a

16   document to the filing, are you frustrating that order?

17       A.    I can see in that situation it would, yes.

18       Q.    And you did that in this case, correct?

19       A.    Yes.

20       Q.    And after you learned of the Judge's order, you

21   still sent those emails that we've already gone over,

22   State's Exhibits One and Five, out to dozens, if not

23   hundreds of people?

24       A.    Yes.

25              THE COURT:  May I see that?

1    Q.    BY MS. RANSOM:    And you mentioned that you

2    reviewed Mr. McIntyre's citation of authorities to you,

3    including the statutes?

4    A.    Yes.

5    Q.    Did you review the grand jury -- what's called

6    the grand jury secrecy statute, 13-2812?

7    A.    Yes.

8    Q.    Does 13-2812 have any exceptions for publicizing

9    grand jury transcripts when you don't have a court order

10   allowing you to do that?

11   A.    Um, two things.    If -- if I could have the

12   statute to look at, and you could repeat the question to

13   make sure.    I'm not trying to be devious, I just --

14   Q.    No, not at all.    I don't expect you to memorize

15   it.

16   A.    Exactly.    I mean I remember in general what it

17   says, but when you say exceptions.

18   Q.    Um, and I don't have a copy of it, but I have

19   written all over it.

20   A.    Probably in the books over there on the wall.

21   Q.    Yeah.    So we'll grab it for you.

22         THE WITNESS:    Can I get some more water, Your

23   Honor?

24         THE COURT:    Sure.    Go ahead.

25   Q.    BY MS. RANSOM:    And I'll go ahead and put this

1  in front of you.  Do you have any objection if I just read

2  it into the record?

3      A.    I'd like to look at it also, but I have no

4  objection.

5      Q.    Oh, absolutely.  13-2812, Unlawful grand jury

6  disclosure.  Classification.  Subsection (A):

7          A person commits unlawful grand jury disclosure

8  if the person knowingly discloses to another the nature or

9  substance of any grand jury testimony or any decision,

10 result or other matter attending the grand jury proceeding,

11 except in the proper discharge of official duties at the

12 discretion of the prosecutor to inform a victim of the

13 status of the case or when permitted by the court in

14 furtherance of justice.

15         Before I ask you more about the statute, have I

16 covered all of the times that you sent the protected

17 materials out to the public after October 8th, 2017?

18     A.    I don't have an easy way to say for sure.  I mean

19 if there were -- and typically there are more people added

20 to the email list weekly or monthly, and it's possible that

21 I sent it to some additional people who didn't get the

22 first.  I don't recall for sure.

23     Q.    All right.  So you think there may be more

24 instances where you disseminated the protected materials?

25     A.    Maybe.

1        Q.    And would all of those instances be after

2    Mr. McIntyre reached out to you and provided you with

3    citation to authorities?

4        A.    Almost certainly.

5        Q.    Okay.  And why are you disseminating the

6    authorities despite that statute that Mr. McIntyre drew your

7    attention?

8              THE COURT:  Why are you disseminating the

9    authorities?

10        Q.    BY MS. RANSOM:    I apologize.  Why are

11    disseminating the protected materials, despite that statute?

12        A.    Well, probably because it's a part of the story,

13    and it's an important story and important -- a matter of

14    importance to the public.

15              In my research of this statute, I decided that it

16    was not likely applicable to me in my circumstance, and that

17    it might well be unconstitutional.

18        Q.    Did you see the case law cited by the Plaintiff

19    in its application that was served on you on December

20    7th, 2017?

21        A.    I'm sure I saw it.  I'm sorry.  Which case law

22    was it?

23        Q.    For example, the Samaritan Health System case.

24        A.    Yes.

25        Q.    Did you read that case?

1      A.    I recollect that I did.  I couldn't recite the

2   principles that are found in it right now, but.

3      Q.    Do you recall that case talking about grand jury

4   materials being secret?

5      A.    I read many cases with similar conclusions.

6      Q.    Okay.  And did you see a lot of those in the

7   December 7th filing from the County?

8      A.    I don't remember a lot, but I'm sure there were

9   several.

10     Q.    And but then on December 9th and the 14th you

11  nonetheless disseminated the protected materials?

12     A.    I did.

13     Q.    It's because you believed that those cases don't

14  apply to you?

15     A.    That's correct.

16     Q.    How so?

17     A.    I think we'd have to do a case-by-case analysis

18  or comparison, and I'm not really prepared to do that at

19  this second.  This law, 2812, um, best I can tell from

20  reading Gerbers -- Gerber or Gerbers, whatever it is.

21  Gerber -- was adopted 60, 80 years ago, based on the New

22  York penal code.  And there was hardly any case law citing

23  this particular Arizona statute, but it almost certainly

24  intended to restrict people who are participants in the

25  process from talking about the process before some time was

1    up, and before the party was made aware of his indictment,

2    or before he was under arrest, or before the grand jury had

3    concluded their -- their duties.

4         Or a companion, I think -- companion might not be

5    the right word -- the next statute, 2813, has a little bit

6    of time period language in it that 2812 doesn't have.  So

7    the way it currently reads, no grand juror could ever talk

8    to anyone about what happened in a grand jury proceeding,

9    and I doubt that that's -- was the intent of the

10   legislature.  And even if it was, I don't think that that's

11   constitutional.

12        Q.   Aside from grand jurors, does it not also

13   prohibit individuals such as yourself from disseminating

14   grand jury materials on its face?

15        A.   When you say on its face, I'm disputing that

16   really intends to apply to anyone other than the people who

17   are involved in the process.  So if you say am I a person,

18   well, yeah, I'm a person.  But if -- my belief is that it

19   was intended to apply to the prosecutor, the court

20   reporters, the grand jurors, while they were in fact grand

21   jurors, any other court -- the witnesses, um, but not to be

22   forever, and not to just anyone who happened to -- to obtain

23   the information.

24        Q.   And you believe this despite your prior

25   experience in 2014 with secrecy in grand jury proceedings?

1    A.    To my knowledge, I wasn't found to have done

2    anything wrong in 2014.  I communicated with a grand juror

3    about the rights and the responsibilities of grand jurors.

4    Q.    And at a minimum, by October 11th, 2017, you

5    understood that the County Attorney had a different

6    understanding of that particular law than you do?

7    A.    I was aware of that, yes.

8    Q.    And actually when you responded to the County

9    Attorney it was really your position that it was

10   unconstitutional, not that it didn't apply to you, correct?

11   A.    I'm sorry; which responses are we talking about

12   now?

13   Q.    The responses contained in Exhibit Five?

14   A.    My filings or my emails?

15   Q.    Your emails with Mr. -- with Mr. McIntyre?

16   A.    I think I said both.  I said I've concluded that

17   I've broken no law, which is to say I don't believe that

18   this law applies to me.  And I defend my actions and

19   probably challenged the constitutionality of the statute.

20   Q.    Ah, correction to the record.  It's Exhibit Two

21   and not Exhibit Five.

22   A.    Yeah.

23   Q.    Why would you need to challenge the

24   constitutionality of the statute if you didn't violate it?

25   A.    Um, I think both are valid arguments.  I'm not

1    sure that there's some reason why I would need to limit my

2    defense to one or the other.

3        Q.    All right.  So you do acknowledge that under

4    certain circumstances that statute could understandably be

5    read to encompass your actions in this situation?

6        A.    As the saying goes, I recognize that honest

7    people can differ in their interpretations of things.

8        Q.    And despite your knowledge that Mr. McIntyre's

9    interpretation of the applicability of the law differed from

10    your own, you proceeded to repeatedly publish the protected

11    materials again, correct?

12        A.    I did.  And with no disrespect to County Attorney

13    McIntyre, he doesn't issue court orders so it's his opinion.

14    I understand that.

15        Q.    Nor did you apply to the court for a court order

16    allowing you to disseminate the materials, correct?

17        A.    I didn't believe that I needed to do that either.

18        Q.    Did you ever attempt to demonstrate to a court

19    that publication of those materials would be in the

20    furtherance of justice?

21        A.    I never made any such attempt.

22        Q.    All right.  And you haven't made any such attempt

23    in the documentation filed in this case either, have you?

24        A.    I don't believe it's necessary.

25        Q.    Did you ever talk to Tim Steller about this

1    situation?

2        A.    Yes.

3        Q.    When did you do that?

4        A.    Um, mid-December, maybe late December -- I don't

5    remember -- of 2017.

6        Q.    All right.  And what did you say to Tim Steller

7    about this case?

8        A.    He's been on my email list for quite a long time,

9    and he contacted me and said tell me what's this all about,

10   and so I told him what it was all about.

11       Q.    Did you tell Mr. Steller that a full and complete

12   copy of the grand jury transcript had been attached to Mr.

13   Wilkison's motion for remand?

14       A.    I don't recall whether I told him that or not.  I

15   told him I was not able to get all of the pages that were

16   attached to the motion on the night that I got the copy.

17       Q.    Did you read Mr. Steller's article that he wrote

18   about this case?

19       A.    Yes.

20       Q.    Did you see in his article how he indicated that

21   you'd obtained the motion or the grand jury transcript after

22   Mr. Wilkison had attached a full and complete copy to the

23   motion for remand?

24       A.    I don't remember that section.  If you have a

25   copy of the article or is it in here?

1        Q.    No.

2        A.    No.  Um, I don't recall.

3        Q.    Do you know where Mr. Steller may have gotten

4    that understanding?

5        A.    No.  He may have gotten it from me, but I don't

6    remember.  He made a couple of other minor errors includ --

7    well, that is everybody's opinion it was minor -- but he

8    made other errors in the article as well, if that was an

9    error.

10       Q.    Okay.  Did you provide Mr. Steller with a copy of

11   the grand jury transcript when you were speaking with him?

12       A.    I don't think directly.  I mean he had access to

13   the links the same as everybody else did.

14       Q.    Do you know why it would be material to

15   Mr. Steller to think that Mr. Wilkison was the source of a

16   grand jury transcript as opposed to you; if you know?

17       A.    The answer, of course, is I don't know.  It's not

18   like he explained it to me.  So the answer is no.

19       Q.    Okay.  And but you may be the reason -- you may

20   have told Mr. Steller that a full and complete copy of the

21   grand jury transcript was attached?

22       A.    I don't know.  I suppose I may have said that,

23   but -- or more likely he misconstrued that when I told him

24   that I didn't have enough money to buy the whole transcript

25   on the afternoon in question, but I knew there was 50 or 60

1   pages more, and so I don't -- I don't know what I was

2   thinking.

3        Q.    Um, you've had a couple of jail calls with Roger

4   Wilson, correct?

5        A.    I don't know how many, but quite a number, yes.

6        Q.    Okay.  And in the interests of time, I'm not

7   going to go through the jail calls again, or I'm not gonna

8   play the jail calls.  But you did mention in one of the jail

9   calls, which are the State's admitted Exhibit Eight, that

10   you sent the grand jury transcripts to a few police types.

11   Who were those individuals?

12        A.    I actually don't remember at the moment, but I

13   have quite a number of retired policemen, both in Cochise

14   County and outside, and -- and current law enforcement

15   officers who are readers, and or read and write, and some of

16   them have been helpful in helping me to understand processes

17   and procedures and understanding jargon, lingo, whatever.

18              And so sometimes I do send documents to them and

19   say, what's this or something.  Again, I'm not trying to be

20   devious.  I really don't remember who it was I might have

21   sent it to at that time.

22        Q.    Do you remember if -- these jail phone calls are

23   on September 11th and September 6th of 2017, correct?

24        A.    Uh-huh.

25        Q.    Is that a yes?

1       A.     Yes.  I'm sorry.

2       Q.     Okay.  So by that time you'd sent the grand jury

3   transcript that Mr. Wilkison had provided to you to one or

4   more police types?

5       A.     If that's what I said, I'm sure that's what I

6   did, yes.

7       Q.     Okay.  A couple of fel -- two fellow reporters?

8       A.     Sounds right.

9       Q.     Jan Wilson?

10      A.     Yes.

11      Q.     And you attempted to Roger Wilson?

12      A.     That's correct.

13      Q.     Okay.  But you did not publicize the grand jury

14   transcript at that time on your website?

15      A.     That is correct.  I think the first time that

16   I -- I probably -- not probably, I almost certainly uploaded

17   the document into our document -- document storage and

18   retrieval is the first thing that we use, but didn't make

19   that link available publicly to anybody until I published

20   this story related to it.

21      Q.     Okay.  And I guess I'm confused, because I could

22   swear I scribbled it down when you said it.  That you said

23   the story wasn't really related to the grand jury; it was

24   related to the motion for remand.

25      A.     Well, I did say something like that.  The

1    story -- I had observed David Wilkison, I think in this

2    courtroom in another matter, make a very bold and strong

3    argument about what he believed to be abuses of the grand

4    jury procedure in another case.  I think it was in the

5    Chesmore case.  And I was real impressed, and I got a copy

6    of the hearing transcript, as I recall, and read more about

7    that case.

8         Then when Wilson got -- when Wilson shot Arvizu

9    and got indicted and Wilkison got appointed to that case,

10   he -- I read about all this stuff, and then Wilkison filed a

11   motion to remand and that was the story.  It was this young,

12   passionate out-of-county attorney who was complaining about

13   the grand jury processes in Cochise County.

14        Q.    When Mr. Wilkison provided you with the grand

15   jury transcript, did he give you any instruction as to what

16   you were to do with it?

17        A.    No.  Instructions, no.

18        Q.    Did you understand that you were supposed to give

19   it directly to Mr. Wilson and no one else?

20        A.    No.  I understood that the intention, because I

21   asked him for it, was to give it to Roger Wilson.

22        Q.    And did you also understand the intention was to

23   not disseminate it beyond Roger Wilson?

24        A.    No.  We had no such agreement.

25        Q.    Did he need to have an explicit agreement with

1    you for you to understand that?

2        A.   He knows I'm a reporter.

3        Q.   How about your police types; when you sent the

4    grand jury transcript to them, did any of them react to

5    that, the fact that you had the grand jury transcript?

6        A.   No.   You mean react like you shouldn't have that,

7    or how the heck did you get this?   I got no such reaction.

8            MS. RANSOM:   Nothing further.

9            THE COURT:   Thank you.   All right.

10           So Mr. Morgan, you're self-represented in this

11   matter.   Ordinarily, if you had an attorney, this would be a

12   time and your attorney would be asking you questions that

13   are related to the direct examination that you just had.

14           Obviously, you don't have an attorney, but you're

15   still entitled to the equivalent.   So you can give testimony

16   that is as if you were being asked questions.   You don't

17   have to ask questions.

18           THE WITNESS:   I understand.

19           THE COURT:   But I mean you're entitled to give

20   testimony that is related to the direct examination that you

21   just gave.

22           THE WITNESS:   Okay.   Thank you.   Yes.

23           May I get my notebook off of my --

24           THE COURT:   Yes.

25           MS. RANSOM:   Your Honor, may we go off the record

1    for just a moment?  Um, my representative needs to step out

2    for a moment.

3                THE COURT:  Yeah.  I always like to ask if you

4    want to take a or need to take a brief recess?

5                MS. RANSOM:  Yes.

6                THE COURT:  Okay.  So I'll step off.  You folks

7    just let me know when you're ready to come back.

8                (Whereupon Court stands at recess.)

9                THE COURT:  Court's back in session.  So this is

10   effectively, Mr. Morgan, your self cross-examination or your

11   self-examination.

12               THE WITNESS:  Perhaps we could start -- could I

13   introduce, please, the exhibit of the -- I think it's

14   Defense A-1, 2, 3.

15               THE COURT:  Let's show the witness.  Have these

16   been shown to the State?

17               MS. RANSOM:  They have, Your Honor.

18               Just to make a record, I understand, I believe

19   it's Exhibit Two has -- it's fully sealed or has never been

20   opened.  Oh, A, B, C.  Excuse me.

21               Okay.  So my understanding from Mr. Morgan is

22   that A-2 is sealed and never been opened.

23               THE COURT:  So how exactly has that been marked?

24               MS. RANSOM:  A-2.

25               THE COURT:  So you want A-2 -- you want A-1, A-2,

1   and A-3?  I have no idea what these are.  Okay.  I'll put

2   these before the witness.

3           MS. RANSOM:  We'll just have the witness lay

4   foundation as to what these items are.

5           THE WITNESS:  So I believe it was on

6   September 5th when -- I don't recall the day -- I went to

7   visit Roger Wilson in the jail in Nogales, and he was

8   complaining of not having any paperwork to look at in his

9   case.  And probably during that trip on the way home or

10  something, I was riding with a friend, maybe it was with Jan

11  Wilson, I'm not sure.

12          But at any rate, I texted Attorney Wilkison and

13  related the fact that Roger Wilson was frustrated that he

14  didn't have anything to look at so that he could try to

15  develop his defense, and his attorney had not yet -- my

16  recollection is his attorney had not yet received any of the

17  documents or any of the disclosure anyway, and had not been

18  to visit Mr. Wilson.

19          And I asked, and I think there's an email or a

20  text exchange in one of your exhibits that -- between myself

21  and Mr. Wilkison -- that says basically is there anything

22  that I can do to help to get any of that information.

23          MS. RANSOM:  Note for the record it's Exhibit

24  Nine.

25          THE WITNESS:  Thank you very much.  Oh, I know.

1    The clerk didn't mark them.  So, and during that exchange I

2    said something like, maybe we could start -- because my

3    recollection is I knew he didn't have the disclosure yet;

4    that is the attorney didn't have the disclosure yet, so I

5    didn't do it.  Oh, there it is.  I see what you mean.  So,

6    and I can't read it.

7            MS. RANSOM:  I'll note for the record Exhibit

8    Nine's been published.

9            THE WITNESS:  Thank you.

10           THE COURT:  The witness is being handed Exhibit

11   Nine.

12           THE WITNESS:  Okay.  Well, Attorney Wilkison

13   explains to me that he didn't get the discovery until

14   August, and I told Roger that was the reason for him not

15   getting discovery sooner.  Um, it's like a broken record

16   with him.  Okay.  Then I say, is there anything I can do to

17   assist you in getting those documents to him, maybe start

18   with the grand jury transcript, and then he says, don't --

19           (Whereupon the court reporter interrupts the

20   proceedings due to not being able to hear the witness.)

21           THE COURT:  Let's, uh -- I take it -- let's --

22   yeah.  The court reporter's got to take everything down.

23           THE WITNESS:  I know and I apologize.

24           THE COURT:  So you had an email exchange with

25   Attorney Wilkison?

1           THE WITNESS:  Well, it's a text; a cell phone
2    text.
3           THE COURT:  Sorry.  Text exchange.  The gist of
4    which is frustrations by Mr. Wilson?
5           THE WITNESS:  That's right.
6           THE COURT:  So what's important about that with
7    respect to your testimony?
8           THE WITNESS:  At that point I asked Attorney
9    Wilkison if I could assist and maybe start with the grand
10   jury transcript, and Mr. Wilkison responded:  I can email
11   you the grand jury transcript.  And that appears to be on
12   September 5 when we had this exchange, and I think that same
13   day I got it.  I don't remember, but I think so.
14          And two days later, maybe the next day, I printed
15   out that grand jury transcript, complete, whatever exhibits
16   were there, everything that came in the email, and I made a
17   copy of I think the Chesmore motion to remand, also by the
18   same attorney, and I put both of those and my business card,
19   not even a letter, nothing else, in an envelope and sent it
20   to Roger Wilson in Santa Cruz County Jail on September 7,
21   thereby fulfilling what I thought I had promised both of
22   them, or I believe I did promise both of them.
23          Unfortunately, the county jail sheriff would not
24   deliver the documents to Mr. Wilson, and a couple or three
25   weeks later returned them to me with a notice that said I

1    had falsely labeled the envelope.  Doesn't appear that they
2    ever opened it, so I'm not quite sure how I falsely labeled
3    it.
4            But anyway, so that's -- I obtained the
5    transcript from Attorney Wilkison by email.  I read and
6    noted -- and I don't know if you've introduced it yet -- the
7    email from Attorney Wilkison to Deputy County Attorney Lori
8    Zucco, explaining that he had sent me -- it's one of the
9    exhibits, but has it been introduced yet?  I'm not sure.
10           MS. RANSOM:  It is State's Exhibit Seven, which
11    has been admitted.
12           THE WITNESS:  Thank you.  So in it, Mr. Wilkison
13    relays to Deputy County Attorney Zucco that he gave me a
14    copy of the transcript.  It's not inaccurate, but it could
15    be a bit misleading, to my knowledge.
16           THE COURT:  Excuse me.  Exhibit Seven is before
17    the witness.
18           THE WITNESS:  Thank you, sir.  To my knowledge he
19    never handed me a copy of the grand jury transcript.  He
20    emailed me a copy, and I printed it out and attempted to
21    send a copy on, and then used it to write into my news
22    story.
23           At no time did I know, believe, have any kind of
24    agreement with Attorney Wilkison that I couldn't read it or
25    share it or publish it, for that matter.  He didn't -- I

1    don't recall if we discussed any of that, but we certainly

2    didn't have any agreement about it.  And I was quite sure

3    that he was aware I'm a reporter and interested in such

4    matters.  So I took -- to that part of the direct

5    examination, I think that's all I have to add.

6              And with regard to there isn't any question,

7    there never has been any question, I've never tried to avoid

8    explaining that I did publish these materials.  I was aware

9    that it would cause some consternation.  I was aware that

10   County Attorney McIntyre's position was that, and

11   subsequently other people's position was that this was, um,

12   prohibited or -- I guess prohibited is right.

13             One statute is a criminal statute.  The other two

14   statutes that are cited aren't criminal statutes, but

15   clearly try to restrict access to these materials, and I

16   understood all of that and I published it because the story

17   is so important.

18             I don't believe I've got anything else to add at

19   this time, Your Honor.

20             THE COURT:  All right.  Thank you, Mr. Morgan.

21             Does the County Attorney have any redirect?

22             MS. RANSOM:  Yes.

23                      REDIRECT EXAMINATION

24   BY MS. RANSOM:

25        Q.   Mr. Morgan, you just noted that when you -- I

1    want to make sure I'm not putting words in your mouth.

2          You said that when you -- when you published all

3    the protected materials, you knew it would cause

4    consternation.  Why did you know it would cause

5    consternation?

6    A.   Well, of course Attorney McIntyre, County

7    Attorney McIntyre had made clear that he wanted me to remove

8    public access or -- yeah -- remove the items or make them

9    not available to the public, so.

10    Q.   But that was a couple days later, correct?  It

11    was a couple days after you originally posted the protected

12    materials?

13    A.   Yes.  It was just a few days.

14    Q.   But it is your testimony that when you posted

15    these protected materials on October 8th, you knew it would

16    cause consternation?

17    A.   When I wrote the story and published, yes, I was

18    quite certain that it would cause a number of people some

19    discomfort for various reasons.

20    Q.   All right.  And who did you believe you would

21    cause consternation, to feel consternation?

22    A.   Well, two basic groups.  The County Attorney's

23    Office, and -- and, um, the Arvizu family and friends or

24    supporters, however you look at that.

25    Q.   If we look at State's Exhibit Nine, which is

1    published, and I also believe you have it in front of you,

2    when you're talking to Mr. Wilkison about --

3        A.    Yes.

4        Q.    Um, there's a point at which you say, is there

5    anything I can do to assist in getting those documents to

6    him.  Maybe start with the GJ transcript.

7            Did you write that statement?

8        A.    I did.

9        Q.    Why did you want to start getting documents to

10   Roger Wilson with the grand jury transcript?

11       A.    I don't recall for sure.  It could be because he

12   asked for it.  It could be because -- actually, that's my

13   sort of vague recollection, is he wanted to know --

14   actually, now the more I think about it, almost sure that's

15   what it was.  He wanted to know what was said to the grand

16   jury to get them to return an indictment for first degree

17   murder, since his position was and is that he was defending

18   himself on his property.

19       Q.    And Mr. Wilson said this to you during a jail

20   call?

21       A.    Well, my recollection is -- what day of the week

22   was September 5th?  Anyway, my recollection is this was on a

23   return trip from Nogales to Sierra Vista or Bisbee, and so

24   it would have been a video visit at the Nogales -- at the

25   Santa Cruz County Jail.  You can't -- you don't visit in

1    person there.

2        Q.    You were video visiting while driving from Bisbee
3    to Sierra Vista?

4        A.    Well, I wasn't driving.  But, no, it was after --
5    my recollection is this was subsequent to -- I don't
6    understand the times on these.  One of these things says
7    September -- oh, I see.  Another one is 9/25, not 9/05.  It
8    says nine -- it says 5:17 p.m. on September 5th.

9            So, again, I'm guessing that I was riding with
10   somebody back from Nogales after a video visit at the jail
11   facility, and had the exchange with Attorney Wilkison.
12   Yeah.  It says I just left Roger.  I'm en route back to
13   Sierra Vista and Bisbee now.  And at the very top of that it
14   says, I got the transcript today of your grand jury
15   challenging Chesmore.  So, yes, that was the other document
16   that I attempted to deliver to Roger Wilson.

17       Q.    Are you able to go get copies of the grand jury
18   transcripts from the clerk?

19       A.    Not commonly, no, but sometimes.

20       Q.    When --

21       A.    And not because -- the grand jury transcripts are
22   a part of the record, but they're filed separately.  They're
23   not in the main case file with the clerk's office.  However,
24   not infrequently, I wouldn't quite go so far as to say
25   regularly, but not infrequently defense attorneys attach

1    some or all of the pages of a grand jury transcript to a
2    motion to remand. I have, again, not always, but regularly
3    when the motion to remand looks particularly interesting, I
4    acquire the motion and the attached pages.
5         Q.    When have you done that, other than this case?
6         A.    I don't know if I could remember the case names,
7    but there was some pretty recent in the last two, three
8    months, subsequent to this publishing event as a matter of
9    fact.
10              Eric Manch represented -- it was a case with
11   multiple codefendants and five attorneys. I think all filed
12   motions to remand. I think this was the RV carrying liquid
13   meth case. David Wilson, no relationship to my knowledge.
14   His lady friend. I don't remember. It was like five
15   defendants, five attorneys, and they all filed motions to
16   remand, and two or three of them attached part or all of the
17   grand jury transcript to the motions to remand, and I
18   obtained copies of probably whatever was there. I don't
19   remember right now.
20        Q.    And all of this is after you publicized grand
21   jury materials online and made a news story out of it?
22        A.    Yes.
23        Q.    Other people followed suit?
24        A.    Other?
25        Q.    Other people filed them as well?

1      A.    Oh, other attorneys filed.

2      Q.    You're not an attorney though?

3      A.    No, I'm not an attorney.

4      Q.    Before you obtained a copy of the grand jury

5   transcript from Mr. Wilkison, had you ever gone to the clerk

6   of the court and obtained a copy of the grand jury

7   transcript yourself?

8      A.    The answer is probably yes, um, but I can't tell

9   you for sure.  I mean I acquire hundreds of pages of

10  documents every month.  Thousands of pages over several

11  years.  Follow dozens of cases at any given time.  So I

12  can't tell you for sure, but almost certainly sometime in

13  the past somebody's attached pages to their motion to

14  remand, and sometimes it was the full transcript so.

15     Q.    But as you sit here today you can't remember a

16  specific instance, and your suggestion to Mr. Wilkison is

17  that he give you the grand jury transcript so you can pass

18  it on to Mr. Wilson, is that it?

19     A.    Yes.

20     Q.    And that's because you knew you couldn't

21  otherwise get it, right?

22     A.    Not exactly.  Um.

23     Q.    There was no motion for remand filed at that

24  time, was there?

25     A.    No.

1      Q.    And you can't get a copy of the grand jury

2    transcript absent an attorney potentially attaching some of

3    it, as you've testified?

4      A.    I agree.

5      Q.    So you needed Mr. Wilkison to provide it to you,

6    correct?

7      A.    I wanted Mr. Wilkison to provide it to me.   I

8    asked him for it and he said okay.

9      Q.    And you asked him for it under the auspices of

10    assisting in getting a document to his client, correct?

11      A.    Yes.

12      Q.    And it's your position that it's Mr. Wilkison's

13    fault that he didn't text you back:  By the way, don't you

14    dare send this to anybody else if I entrust you with it, as

15    you've suggested?

16      A.    Candidly, I suspect that neither of us spent very

17    much time thinking about it that long.  I'm not an attorney,

18    even though I'm aware of how most of this works.  I'm a news

19    guy, and he knows that's what I do, and he knows that I

20    follow court cases and I'm interested in all the detail.

21          And so he knows -- well, I don't know how much he

22    knows, but he -- it didn't make any -- in looking back on

23    it, at the time, again, I didn't think about it, but.

24          I don't have any special access to deliver

25    anything to Roger Wilson.  So it would be, seems to me

1    looking back, silly if he thought that somehow he could --
2    that I could get this document to Mr. Wilson and he
3    couldn't.  So he sent it to me for who knows exactly what
4    reason.  I told him I would get it to Wilson.  I tried to
5    get it to Wilson.

6          But did I think for a minute that I was trying to
7    trick him into giving me something I didn't have -- have
8    the -- another way to get or the right to get it?  I don't
9    think I even spent a moment thinking about that.

10        Q.    Did you tell Mr. Wilkison that you planned on
11    publicizing the grand jury materials on your website before
12    you did it?

13        A.    No.  At that moment, frankly, I didn't have a
14    plan.  This was September 5th, and I published that story
15    after he filed the motion to remand.  I didn't even know he
16    was going to file a motion to remand.

17        Q.    As to the -- you also mentioned that other
18    materials, the other statutes unequivocally find that
19    there's restricted access to certain information.  What did
20    you -- what do you understand to be restricted access that's
21    not supposed to be publicized?

22        A.    When you say unequivocally, again, if we had the
23    statutes in front of us to look at.  Both of them direct
24    government agencies.  One of 'em was the question about
25    photos of the deceased, and the other one is about grand

1    juror names.

2          Again, without having it in front of me to look
3    at, they both direct government agencies what they can and
4    cannot or may or may not or should or should not do with
5    those kinds of materials.  Those statutes aren't directed to
6    me.  They're directed to the clerk of the court or the clerk
7    of the grand jury or the custodian of the records of police
8    records or autopsy photos or whoever actually has them in
9    their hand.

10        Q.    If those statutes do not in fact contain the
11   words clerk of the court or jury commissioner or other
12   government agencies that you just mentioned, would they
13   actually apply more broadly?

14        A.    I'm sure they could be interpreted that way.
15   It's not the way I interpret them.

16        Q.    So you chose to interpret the statutes that
17   wouldn't apply to you?

18        A.    Um, I don't pretend to be an attorney, but I've
19   spent a lot of time in and out of the news business, and
20   read lots of case law related to the First Amendment.  And,
21   um, the currently popular Pentagon's -- Pentagon papers
22   story in The Post, the movie, is maybe a good illustration.
23   Those were stolen documents.  The reporter and the publisher
24   knew that those were stolen documents.  They were not
25   intended to be made public.  They were military secrets, and

1    the United States Supreme Court still said we can't

2    intervene at this point.  We can't stop you from publishing

3    this.  It's improper.  So unless you've got some other

4    remedy, but you can't say you cannot publish these things.

5        Q.    Does the Pentagon papers case deal with grand

6    jury proceedings?

7              THE COURT:  I think we're getting into the area

8    of argument, which is fine, but let's just --

9              MS. RANSON:  That was my very last question, Your

10   Honor.

11       Q.    BY MS. RANSOM:   If you know, does the Pentagon

12   papers case deal with grand jury transcript proceedings?

13       A.    No, it does not.

14             MS. RANSON:  All right.  Nothing further.

15             THE COURT:  Thanks.  Real quickly, I just have

16   some, couple questions just to make sure I understand all

17   the facts and the sequence of events.

18             You just took us through on September 5th,

19   Attorney Wilkison sent you the grand jury transcripts,

20   right?

21             THE WITNESS:  Yes.

22             THE COURT:  And then with respect to the remand,

23   the motion for remand.  I'm not -- when was the motion to

24   remand filed?  Do we have some -- or it's just a matter of

25   record?

1           MS. RANSOM:  There was testimony to that effect.
2  October 6th, Your Honor.
3           THE COURT:  Thank you.  October 6th.
4           MS. RANSOM:  It's also in the file that you took
5  judicial notice of under seal.
6           THE COURT:  Okay.  And it was your testimony that
7  you were there at the clerk's office when Attorney Wilkison
8  was actually filing it?
9           THE WITNESS:  That is correct.
10          THE COURT:  Is that how you got the motion to
11 remand, directly from Attorney Wilkison?
12          THE WITNESS:  No, from the clerk of the court
13 immediately after he filed it, or immediately as he filed it
14 really.
15          THE COURT:  All right.  So you paid someone a fee
16 that the clerk has to get copies?
17          THE WITNESS:  Fifty cents a page for times 12.
18          THE COURT:  So you got the 12 pages.  That was my
19 question.  There were 50 or 60-odd pages in exhibits.  You
20 did not obtain that at that time, those exhibits?
21          THE WITNESS:  The 50 or 60 is just my vague
22 recollection, um.
23          THE COURT:  Whatever the number of pages.
24          THE WITNESS:  Correct.  Yes.
25          THE COURT:  My question is when and how did you

1    get those exhibits?

2                THE WITNESS:  I don't know that I acquired them

3    from the clerk's office at all.  I don't remember it because

4    I -- I just don't recall.  About 10 days later the -- the

5    motion to remand was sealed, and so I couldn't go to the

6    clerk's office and get a copy of it, of the full.

7                THE COURT:  What's your recollection of how you

8    got -- when and how you got the exhibits?  That's the part

9    that I missed, if it was there.

10               THE WITNESS:  I don't recall, and I'm not even

11   sure if I ever did.

12               THE COURT:  Well, the link, the hyperlink that is

13   shown in the exhibits, is to the motion to remand.  Does

14   that include -- if somebody clicked on the hyperlink, would

15   that include the motion, plus the exhibits?

16               THE WITNESS:  If I ever got the exhibits to the

17   motion, then I would have attached it to the same document,

18   because it's a part of that document and everything would be

19   there.  But I don't recall, since it was my understanding

20   that the -- from reading the motion, and then later deputy

21   county attorney's motion to seal, my understanding is that

22   the exhibits were the grand jury transcript, and I already

23   had the grand jury transcript.

24               So I don't think I ever went back to -- I'm quite

25   sure I never acquired them from the clerk's office, and I

1   can't remember if Roger Wilson obtained a copy of them and

2   sent them to me or had them hand-delivered to me in that

3   package of stuff I got in the courtroom, but I don't

4   remember.

5           THE COURT:  How did you get the photograph of the

6   victim in that case?

7           THE WITNESS:  It was a part of the grand jury

8   transcript.

9           THE COURT:  All right.  Now the County didn't go

10  into this, and but if you don't want me to go into this I

11  won't.  I try to let people try their cases.

12          But what about -- I didn't hear any testimony

13  about the -- where the witness finally derived the

14  information identifying the information about the grand

15  jury, the grand jurors themselves.  So I was gonna ask those

16  questions.  I won't do it if -- I like to let people try

17  their cases, but.

18          MS. RANSOM:  I was.

19          THE COURT:  You're gonna get there with another

20  witness?

21          MS. RANSOM:  Yes.

22          THE COURT:  Do you have any follow-up questions

23  to the Court's questions?

24          MS. RANSOM:  No.

25          THE COURT:  All right.  Very well.  Thank you,

1    sir.  You can step down now.

2              Let's discuss, it's 10 to five.  Um, you have

3    some more testimony to present.  So what I'm gonna do is get

4    on the phone with my judicial assistant and get some

5    additional time.

6              MS. RANSOM:  Thank you, Your Honor.

7              THE COURT:  All right.  And --

8              MS. RANSOM:  Your Honor, do you want to go off

9    the record for scheduling?

10             THE COURT:  Well, in a second.  I've got some --

11   I've got some questions.  And just for purposes of, let's

12   call it a proffer from the Plaintiff, just so I have some

13   idea of in preparation for the -- the next hearing.  And

14   again, we'll just call this -- we'll call it a proffer, Mr.

15   Morgan.  This isn't evidence.  It's just to kind of what is

16   anticipated that the evidence will show.

17             And here in Cochise County, with respect to grand

18   jury exhibits and grand jury transcripts, when the grand

19   jury returns a true bill are there any court orders that are

20   entered after arraignment on the information or after the

21   true bill?  Are there any court orders that are entered as a

22   matter of protocol in courts concerning dissemination of

23   the -- of grand jury transcripts or exhibits?

24             MS. RANSOM:  Your Honor, the -- Mr. McIntyre

25   would be the State's witness that will testify as to the

1    local Cochise County practice with respect to grand jury
2    proceedings and transcripts.
3              THE COURT: Right.
4              MS. RANSOM: And the State's and or the County's
5    anticipated evidence is that it is not in fact -- there is
6    no standard order that's entered. The County relies upon
7    the plain terms of the statute prohibiting disclosure by
8    anyone of grand jury transcripts. And the practice locally
9    is if an attorney files a motion for remand, they either
10   file a motion for seal or they don't attach the documents.
11             THE COURT: So, again, this is -- well, I'm glad
12   to hear that the witness, Mr. McIntyre, will testify in
13   this. I'm just trying in my own mind to be prepared. So
14   the proffered or anticipated testimony --
15             MS. RANSOM: That's in anticipation.
16             THE COURT: -- would be that with respect to
17   matters occurring before the grand jury, that the grand jury
18   transcripts, grand jury exhibits, documents returned
19   pursuant to subpoena, those are turned over to defense
20   counsel sometime consistent with the rules after.
21             MS. RANSOM: Yes.
22             THE COURT: And there's no court orders that are
23   entered with respect to dissemination of that information.
24   It's just been -- it's been practiced to -- to have defense
25   counsel -- the County Attorney's Office relies upon statute

1    for any restrictions.

2              MS. RANSOM:  Statute and court rule.

3              THE COURT:  Statute and court rule.  So is there

4    a court rule that I need to be aware of?

5              MS. RANSOM:  I believe, off the top of my head,

6    Your Honor, it's 12.9(C).  I would need to double check it.

7              THE COURT:  Is that a local rule or?

8              MS. RANSOM:  Motion for remand rule.

9              THE COURT:  You're talking about Rules of

10   Criminal Procedure?

11             MS. RANSOM:  Yes.

12             THE COURT:  Again, this is all anticipated

13   testimony.  The clerk is gonna retrieve the exhibits.  She's

14   just retrieving the exhibits.

15             All right.  Well, we'll hear from -- we'll hear

16   from the witness on that.  Let me call my -- all right.

17   We'll go off the record.  I'm gonna call my judicial

18   assistant.

19             (Whereupon a discussion is had off the record.)

20             THE COURT:  All right.  So we'll continue to

21   Friday, March 2nd at 9 o'clock, 9:30?

22             Who is the next witness?

23             MS. RANSOM:  Mr. Wilkison and Mr. McIntyre.

24             THE COURT:  Will 9:30 be better for you?

25             MR. WILKISON:  9:30 will be better.

1            THE COURT:  We'll make it 9:30.  He's coming from
2     Tucson.
3            MR. WILKISON:  Thank you, Judge.
4            THE COURT:  All right.  Thanks.  So put it in on
5     Friday, March 2nd at 9:30.
6            MS. RANSOM:  Just to correct, 12.8(c) was what I
7     meant to tell you, not 12.9(c).
8            THE COURT:  12.8(c).  Okay.
9            MS. RANSOM:  12.8(c) is the Rule of Procedure
10    related to the confidential nature of grand jury
11    transcripts.
12           MR. MORGAN:  One other matter, Your Honor.
13           Do I understand correctly then that if assuming
14    that I do get a camera person here that it is okay on Friday
15    March 2?
16           THE COURT:  Yes.  Same --
17           MR. MORGAN:  Subject to the same.  Okay.  Thank
18    you very much.
19           THE COURT:  All right.  Thank you.
20
21           (Whereupon the proceedings conclude.)
22
23
24
25

```
 1                    C E R T I F I C A T E

 2

 3             I, Buffy Deneke, do hereby certify that the

 4      proceedings had upon the hearing of the foregoing matter are

 5      fully and accurately in the shorthand record made by me

 6      thereof, and the foregoing 79 printed pages of said

 7      transcript contain a full, true and correct transcript of my

 8      shorthand notes taken by me as aforesaid, all to the best of

 9      my skill and ability.

10             DATED this 27th day of February, 2018.

11

12
                                    _____
13                                  BUFFY J. DENEKE, AZ #50368
                                    Certified Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

# ATTACHMENT 2