1   that are knowingly speeding, but it doesn't make --

2               THE COURT:  But speeding is not protected;

3   it's not a protected act.  It's not a First Amendment

4   act, so that --

5               MS. RANSOM:  That is --

6               THE COURT:  The constitution issue is if

7   you have a statute -- and again, there is the

8   back-and-forth of argument.  But if you have a statute

9   that is so broadly written and so vague that it can apply

10  to 100,000 people who are engaged in what is otherwise a

11  protected act -- that is, their First Amendment right to

12  speech -- that it doesn't -- it doesn't provide a due

13  process protection of advising people of who is covered

14  by the statute, and it allows -- and I'm not saying it

15  happened in this case, because I'm not going to find it.

16  But it allows prosecutors -- I'm not saying it happened

17  in this case, and I'm not going to find that.  But it

18  allows prosecutors to kind of cherry-pick who to

19  prosecute of all the persons who were caught in that net.

20               What I see is you've got protected

21  information:  The grand jury -- clearly, the grand jury

22  transcripts, if nothing else, photographs and exhibits.

23  And there's -- under that interpretation of the statute,

24  there's just a huge universe of persons who are

25  potentially knowingly disclosing to another who are not

1   official persons who are supposed to have this

2   information under the statute who are out there

3   communicating this and potentially criminally violating

4   the statute, unless they're required to get a court

5   order, which is apparently the position of your office.

6              MS. RANSOM:  It would need to be in the

7   furtherance of justice.  And respectfully, Your Honor, I

8   disagree that the statute is in any way vague.  I do

9   think the opinions like the *Aslamy* opinion and the

10  *Samaritan* opinion and the *Roman Catholic Church* opinion

11  all detail these standards and elucidate the elements

12  which do give people the protections and --

13             THE COURT:  And so Mr. Wilson's mother gets

14  the transcript --

15             MS. RANSOM:  Yes.

16             THE COURT:  -- and she posts it on the

17  Internet or gives it to her neighbor --

18             MS. RANSOM:  Yes.

19             THE COURT:  -- and she knows what

20  Mr. Morgan knows.  Is she caught within the statute?

21             MS. RANSOM:  Yes, Your Honor.  And if you

22  saw the jail calls -- and the reason I can tell you that

23  without hesitation is because I've seen more of the jail

24  calls than you have, and Ms. Wilson is well-aware that

25  she is not supposed to be having grand jury transcripts

1    and disseminating it.

2            THE COURT:  All right.  And then her
3    neighbor knows the same thing, and Ms. Wilson tells her
4    neighbor the same thing, and her neighbor tells that
5    person.  The chain goes on.  All those persons are caught
6    within the ambit of this criminal statute if that chain
7    just continues; is that right?

8            MS. RANSOM:  Only if the elements are
9    satisfied of the statute.  And that is why we need to
10   ensure its protections.

11           THE COURT:  Right.  But, you know --

12           All right.  I was asking Mr. McIntyre:
13   What if someone comes in and they're just a witness
14   before the grand jury -- the bank manager that got bank
15   records, tax returns, whatever --

16           MS. RANSOM:  Yes.

17           THE COURT:  -- and they're questioned and
18   they're shown other documents.  They're questioned by the
19   grand jurors.  There is discussion back and forth.  And
20   they walk out of the courtroom and go to their poker game
21   and tell everybody, "Here is what I was told."

22           MS. RANSOM:  That's the distinction, Your
23   Honor.  The materials that that individual may have
24   provided to the grand jury, that is going to be part of
25   the proceedings.  Those are not going to be discoverable

1   under our statute or under the multitude of cases across
2   the nation that have addressed situations similar to
3   that.

4           But *In Re: Nix* case addresses a situation
5   like that, the *Carlson* case.  And the *In Re:  Grand Jury*
6   *Proceedings*, a Third Circuit case from 2006, is very,
7   very similar to what you just posited.  As far as the
8   testimony of the witness, that unfortunately -- again,
9   since that wasn't at issue here and I didn't bring the
10  case with me, but I know I've seen a reported case where
11  the witness can leave, and the witness can say, "Hey, I
12  know what I know," without violating the grand jury
13  statute.  So they need to --

14          THE COURT:  I'm familiar with the cases.
15  There are cases that matters that are independent --

16          MS. RANSOM:  Yes.

17          THE COURT:  -- of which witnesses have
18  knowledge or that are independent from the grand jury --
19  independently of the grand jury are not considered
20  matters that are subject to the secrecy of the grand
21  jury.

22          But let's posit something different.
23  Somebody goes in there and they do get information from
24  inside the grand jury about something that happened, and
25  the witnesses are presented with documents or exhibits

1   that is not independent of the grand jury, that they

2   didn't have knowledge independent of the grand jury

3   proceedings.

4                    MS. RANSOM:  Yes.

5                    THE COURT:  And then they just go out and

6   talk to people about it, whether it's they're lawyer or a

7   neighbor.  I mean, you look at the language of the

8   statute.  They are knowingly disclosing to another person

9   the nature and substance of grand jury testimony or other

10  matters attending to the grand jury, but they are not

11  engaged in the discharge of their official duties.

12                   MS. RANSOM:  Yes.  So they would be in

13  violation of a criminal statute, and it would be a

14  misdemeanor offense because they don't have the First

15  Amendment right to be sharing that information with the

16  public because these are not public proceedings.  That

17  is, Your Honor, where I'm trying to make sure --

18                   THE COURT:  They don't have a First

19  Amendment right to go and talk to their lawyer or talk to

20  their neighbor, talk to people in their poker game about

21  what they talked about in the grand jury or what they

22  learned about in the grand jury?

23                   MS. RANSOM:  Under the secrecy statute,

24  the --

25                   THE COURT:  So they would be committing a

1  crime?

2        MS. RANSOM:  They would be committing a

3  crime.  Maybe they actually -- they probably have a First

4  Amendment right to say it if they wish to, but they are

5  committing a crime.  It doesn't mean that the statute is

6  unconstitutional or overbroad or vague.  They know they

7  are committing a crime; they are on notice of the

8  knowingness standard, and they can exercise their right

9  to -- people can exercise their right to violate a

10  statute, and then you simply pay the penalty for it.

11        It doesn't mean that the statute is

12  unconstitutionally vague with respect to the First

13  Amendment -- and the issue there is, as we noted in the

14  *In Re: Nix* or the *Carlson*, the *Samaritan* case, is they

15  are closed proceedings.  They are not open to the public.

16  There is not the same level of right of access that you

17  may enjoy when you are a media person, when you are a

18  news guy.  You don't have the same, you know, First

19  Amendment shield that you would have if he goes to attend

20  Mr. Wilson's trial, which I'm sure he will and he will

21  report on it.

22        That's the fundamental difference here and

23  that's why Your Honor should be rejecting the arguments

24  that Mr. Morgan has made, is it's a red herring.

25        THE COURT:  I'm sorry.  I interrupted you

1   in the flow of your presentation, but -- which I have a

2   bad habit of doing.  But if you want to get yourself back

3   on track, if there is more, then go ahead.  I'm sorry.

4               MS. RANSOM:  No problem, Your Honor.  And

5   that is what I was going to get to is a lot of

6   conversation that we just had.  Has Your Honor read all

7   of the cases?  So I'm not repeating them over and over.

8               THE COURT:  Yes.  I read your brief.  Thank

9   you.

10              MS. RANSOM:  All right.  So I won't go

11  through them other than, I think, again, as Your Honor

12  evaluates the argument in the First Amendment versus the

13  Closed Proceedings, I do think the *Constand v. Cosby* case

14  out of the Third Circuit is a good way to illustrate the

15  distinction that we are dealing with here.  Because in

16  that case, Bill Cosby having admissions in a deposition

17  that was sealed, it got unsealed.  Within 20 minutes,

18  it's all over the nation.

19              When he went to the Third Circuit and said,

20  "Hey, you should be able to claw this back," the Third

21  Circuit said, "For you, no.  And we understand, Mr. Cosby

22  and your attorneys, that you have cited all these cases

23  where a claw-back was appropriate and restrictions on

24  access was appropriate and was enforceable and

25  constitutional, but guess what?  That wasn't a grand jury

1  proceeding.  That was a special, closed proceeding.  It

2  is a different sort of circumstance."

3          Your case is distinguishable on that front.

4  That is really at the core of this issue, and that is why

5  the County Attorney's Office's relief is so narrowly

6  crafted.  It is aligned.  It is in accordance with the

7  statute.  It is in accordance with admonitions that

8  juries have.  And although it may seem unfair, it is

9  nonetheless the law of the land.

10          And the D.C. Circuit, as far as I can find,

11 most recently held that the grand jury admonishment

12 remains.  You can't go tell people what happens 40 years

13 later.  That case was about Watergate tapes, and they

14 upheld the District Court's exercise of their discretion,

15 rejecting the request to disclose the Watergate tapes

16 that had been -- and other materials that had been

17 presented to the grand jury.

18          As far as the injunctive relief sought, I

19 do believe the plaintiff has satisfied each of its

20 elements under the applicable authority.  The likelihood

21 of success on the merits, I don't know if Your Honor

22 wishes for me to go through each statute or if we have

23 already adequately covered it as far as our likelihood of

24 success.

25          THE COURT:  It's up to you.  I think I know

1   the arguments and am familiar with the standard, but it's
2   up to you.

3           MS. RANSOM:  Okay.  I think we've argued
4   with respect to 2812.  I do want to highlight the
5   elements as far as knowingness.  And we do, as far as the
6   plain terms of the statute, we've got the defendant, a
7   person, disclosing to another as he himself admits.  The
8   grand jury materials and the attachments, that is all
9   within the purview of protected materials under the
10   *Samaritan* case and that the matters were published has
11   been established.  The defendant himself admits he
12   published it online to others.

13           The knowingness standard.  What evidence
14   demonstrates that the defendant knew what he was doing
15   was wrongful?  You have the defendant admitting that he's
16   well-aware of grand jury proceedings and that they're
17   secret until at least 2014.

18           He acknowledged during the proceedings
19   before this Court on February 20th that he had no basis
20   to object to this Court reviewing items under seal.  He
21   understands when things are under seal, he's not supposed
22   to -- they are not supposed to be publicly available.

23           He admits that he knew that disclosure of
24   the grand jury materials on October 8th would cause --
25   and I quote -- consternation to the County Attorney's

1   Office and the family.  He secured it from Mr. Wilkison

2   under false pretenses.  He told Mr. Wilkison he was going

3   to be delivering it to Mr. Wilson, and then later on

4   says, "Oh, Mr. Wilson should have known I was going to

5   broadcast this everywhere," although Mr. Morgan himself

6   obtained the Chesmore materials by his own admission and

7   didn't broadcast those everywhere.  So really what did

8   Mr. Wilkison have to believe, based on his limited past

9   interactions with Mr. Morgan, with the respect --

10            THE COURT:  Sorry to interrupt you again.

11   But the question about that -- I guess, let's say

12   Mr. Morgan had done what Mr. Wilkison had believed he was

13   going to do.  Wilkison gives these materials to

14   Mr. Morgan, who gives them to Mr. Wilson, right?  So

15   that's what Mr. Wilkison said he thought Mr. Morgan was

16   going to do.

17            MS. RANSOM:  Yes.

18            THE COURT:  So Mr. Morgan takes the

19   materials.  He gives him to Mr. Morgan.  Mr. Morgan hands

20   them over to his mother -- and Mr. Wilson hands those

21   over to his mother and to Mr. Morgan.

22            MS. RANSOM:  Your Honor --

23            THE COURT:  What difference does it make?

24            I mean, then he hasn't violated --

25   Mr. Morgan hasn't done what Mr. Wilkison thought he

1   wasn't going to do.  He turns them over to Mr. Wilson.
2   Mr. Wilson just hands them right back over to him.  Has
3   Mr. Wilson violated the statute?

4              MS. RANSOM:  Mr. Wilson?  Yes, absolutely.
5   Your Honor, in reviewing the jail call between Mr. Wilson
6   and Mr. Morgan, you could see Mr. Wilson, who is facing
7   first-degree homicide charge, had no problem whatsoever
8   taking the fall in order to protect his friend,
9   Mr. Morgan, by claiming he was the one who handed it
10  straight to Mr. Morgan.

11             THE COURT:  So Mr. Morgan gets it from
12  Mr. Wilson, and he does what he did in this case?

13             MS. RANSOM:  Yes.

14             THE COURT:  So what difference does it make
15  what Mr. Wilson thought about why/what Mr. Morgan was
16  going to do with the paper?

17             MS. RANSOM:  It would make a difference for
18  Mr. Wilkison.  But as far as -- as far as Mr. Morgan's
19  knowledge, Mr. Morgan is knowingly publishing something
20  that he knew he wasn't supposed to publish.  His
21  interactions with Mr. Wilkison leads to the inference of
22  knowledge.

23             THE COURT:  Okay.  I see what you are
24  saying.  All right.

25             MS. RANSOM:  And we just went over the

1  conversation between Mr. Morgan and Mr. Wilson during

2  State's Exhibit -- I believe it is 14, where they

3  discuss, you know, what Mr. Wilson is going to say in

4  order to try to help Mr. Morgan stay out of trouble.

5          The defendant also repeatedly disclosed the

6  protected materials after he was admittedly on notice of

7  the County Attorney's position as well as the Court's

8  position as to the protected nature of the materials.

9          That goes not only to his knowing

10 disclosure, in violation of the statute, but to the risk

11 of future harm, which is very, very real here.  We have a

12 very solid record that Mr. Morgan has no intention of

13 stopping unless he is forced to.

14         The defendant has also during these

15 proceedings attempted to place the materials in the

16 record several times, apparently again because he

17 believes if he somehow does a "gotcha" to the clerk of

18 the court or on Mr. Wilkison or on this Court by

19 repeatedly trying to file these items as exhibits, that

20 somehow he is excused from his own liability.  That is

21 not how the criminal statute works.

22         And him admitting to it but then claiming

23 that someone else fostered it and thus he is excused, it

24 establishes our likelihood of success on the merits

25 because he is admitting to doing it.  It doesn't excuse

1  his conduct.

2  And we've also discussed that Defendant
3  wasn't acting within the scope of his official duties.

4  With respect to the plain terms of the
5  other statutes, the State -- I actually already went over
6  the likelihood of success as to the plain terms there,
7  and I'm not going to speak any further.

8  As far as the irreparable harm, we do have
9  the jury taint potential.  It's a small county.  The
10 defendant claims that he sent this to thousands of
11 people.  While we don't know whether or not every single
12 person has read them, it is already difficult to impanel
13 a jury for a first-degree homicide case.  It has been
14 rendered far more difficult by Mr. Morgan's efforts to
15 help his friend, Roger Wilson, by repeatedly
16 disseminating the grand jury transcript.

17 The additional matter which the defendant
18 has not during the course of evidence or in his reply
19 addressed is the protectable interest that the County
20 Attorney has in enforcing his own statutory duties.  That
21 is *Phoenix Orthopedic Surgeons* that the County cited to
22 this Court, and I quote, because the trial court found
23 that the entity had a protectable interest, the
24 irreparable injury can be presumed.

25 The County Attorney certainly has a

1   protectable interest in enforcing the law.  It is his
2   statutory duty, and nobody has attempted to claim
3   otherwise.  I do think irreparable injury, as well as the
4   other actual harms demonstrated, satisfy the County's
5   obligation as to that element as well as the risk of
6   future harm.  I don't think that can be de-emphasized
7   enough, Your Honor, because the County is asking that you
8   craft a future prohibition, given all of the evidence
9   that has been disclosed in the past day and a half.
10              On balance of hardship, although I do
11  believe under the Smith case, we don't need to -- we
12  established the first two elements, we don't necessarily
13  need to establish the last two.  We can still establish
14  the last two.  Those two elements also favor the County,
15  since they are closed.  The grand jury proceedings are
16  closed to the public.  The defendant, who is coming to
17  this court as a news guy, arguing to this Court his First
18  Amendment rights as a media person, he is not harmed
19  because he doesn't have the right to come in and report
20  on these proceedings.
21              Nobody other than the prosecutor has the
22  right to be there, and the witness.  It is -- in fact,
23  the balance of harms then again favors the plaintiff who
24  has been impacted in the ability to effectively
25  administer justice and have a tainted jury as a result of

1   this conduct.

2              Additionally, the public policy supports
3   the requested relief.  We do have -- I think enforcing
4   the laws related to grand jury secrecy has been the
5   public policy of the United States of America since its
6   founding, and enforcing the laws in general is beneficial
7   to the public.

8              The public records request.  Your Honor, I
9   think it was made abundantly clear that the purpose the
10  defendant is seeking to serve in asking for the
11  information is his own personal interest in finding out
12  what the State has on him and what the State might do to
13  him, and that simply does not outweigh the State's
14  interest in ensuring that Mr. Morgan is not going to find
15  out somebody said something about him and then go post it
16  on his Facebook page and scare the person away from
17  cooperating with the ongoing criminal investigation.

18             The statute cited A.R.S. 39-121.04 and
19  39-121.01.  Those are cited to Mr. Morgan as the basis
20  for not responding -- or for not producing documents in
21  response to his request, and that statute in particular
22  does mention that the State may withhold documents when
23  there are concerns about witness intimidation or that
24  witness information may end up being disclosed.

25             The other issue, too, as Mr. McIntyre

1   explained, is that the documents simply may not have been
2   completed yet because it is an ongoing investigation.
3   The defendant's most recent violation of the statute
4   happened yesterday, so -- wait.  Sorry -- February 25th.
5   I'm tired.

6              THE COURT:  I hear you.

7              MS. RANSOM:  So when we have these ongoing
8   violations, we have to continue to ensure we understand
9   what's going on in each.

10             THE COURT:  Let me ask you about the public
11  records request.  I'm not sure if there is really
12  anything that I should be doing about it at this point in
13  time.  There is a statutory scheme for a public records
14  request.  Mr. Morgan has made a public record request.
15  That's why I asked -- let's assume that your office has
16  responded formally and, for the reasons you've stated,
17  denied the request, right?  Isn't what's supposed to
18  happen next pursuant to the statutory scheme nothing,
19  unless and until the person who's been denied the records
20  brings an action to the Court in saying that he or she
21  has been wrongfully denied?

22             I mean, it seems to me like it's kind of
23  like an advisory opinion to rule on it now.  This is no
24  discussion about the merits of the decision not to
25  provide those records.  I mean, but on the statutory

1    scheme, the person makes a request.  The custodian of the

2    records, the agency, responds.  You said you've done

3    that.  Let's assume that's accurate and true.  Check on

4    that.  But if he responded, then that's the end of the

5    matter, unless and until the person who has been denied

6    the records brings a special action in the Superior Court

7    saying, "I've been wrongfully denied."  And that hasn't

8    happened, right?

9                   MS. RANSOM:  That has not happened, Your

10   Honor.

11                  THE COURT:  Why should I do anything?

12                  MS. RANSOM:  He can -- if the County acts

13   without justification, even if -- it's kind of a

14   hindsight Catch-22 for the governmental entity.  You can

15   justifiably say, "Listen, I'm not going to produce this"

16   for a variety of reasons, and let a -- a litigant may sit

17   on it for several months and claim, "Boy oh boy, you

18   waited nine months, and now I get my attorneys' fees and

19   costs because of just the time of delay."  I think we do

20   have a cognizable dispute between the parties as to

21   whether or not the State should be disclosing the

22   information.  Mr. Morgan clearly disagrees with us.

23                  We did bring a declaratory action to that

24   effect.  So I don't think we're asking for an advisory

25   opinion; I think we are simply asking for a declaratory

1    judgment to that effect.

2                    THE COURT:  Okay.

3                    MS. RANSOM:  Again, the narrow standard of

4    relief that we are seeking from this Court is appropriate

5    under *U.S. vs. Nix* as well as the other matters, the

6    other cases that address it, including In re: Grand jury

7    Proceedings case.  I think *U.S. vs. Nix* is most detailed.

8                    So in light of evidence presented, Your

9    Honor, the State does ask that you enter the

10   February 15th, 2018, form of order presented by the

11   County.  I apologize.  I keep saying "the State."

12                   And alternatively, to the extent Your Honor

13   believes that there needs to be a more detailed record in

14   place, I would ask that you enter a temporary restraining

15   order while you give the parties the opportunity to

16   prepare proposed findings of fact and conclusions of law

17   and remit them to you within a week so that you can make

18   further ruling, if you believe that's appropriate.

19                   But if that is the route you go, we would

20   ask that you enter a temporary restraining order in the

21   form previously presented by the County.

22                   Thank you, Your Honor.

23                   THE COURT:  All right.  Thank you very

24   much.

25                   Mr. Morgan, would you like to make a

1    closing argument?

2              MR. MORGAN:   I would, sir.   Would you mind
3    if I remained seated?

4              THE COURT:   That's fine.

5              MR. MORGAN:   Thank you very much.   Of
6    course I oppose issuance of the temporary preliminary or
7    permanent injunction in the matter.

8              There aren't any significant disputes about
9    the facts regarding how I obtained the documents that I
10   published and the news account that I published.   There's
11   been, I think, some mischaracterization about parts of
12   it.   I'm not sure they are critical.   The -- it seems to
13   me the history of the statute, what little we know, what
14   little I could find about it, anyway, a big question is
15   the definition of "disclose" and to whom that was
16   intended to apply.

17             It's my argument -- I think I made it on
18   the 20th of last month -- it was intended to apply to the
19   participants in the process.   I'm not questioning whether
20   the general intent is to keep grand jury deliberations
21   secret.   I understand the reason for that.   I don't argue
22   that those deliberations should be secret.   But there is
23   legitimate public interest in grand jury processes,
24   procedures, certainly interest to make sure that the
25   persons conducting those proceedings are conducting them

1   fairly and in accordance with the law.

2            I think there's a distinction between an

3   individual who might fall in the net, like you're talking

4   about, and a member of the press.  Although I may be

5   among the smallest or, anyways, not part of the major

6   media, for sure, but the function of the press as

7   identified by -- by the Supreme Court is to prevent any

8   part of the government from deceiving the people.  That's

9   from the Pentagon Papers Case, *New York Times vs. The*

10  *United States.*

11           The Pentagon Papers, of course, weren't

12  grand jury documents, but they were stolen military

13  secrets.  They were not intended to be public.  There is

14  not any question about that.  There was criminal

15  penalties applicable to having stolen those documents.

16  The Supreme Court determined that that wasn't sufficient

17  cause to prevent their further publishing and that if

18  some kind of harm came to somebody as a result, well,

19  then the government of the injured parties could do

20  something about it at that point, whether it's criminal

21  action or civil action for damages or whatever, but they

22  couldn't do prior restraint.

23           And though -- I'm sorry.  In the *Nebraska*

24  *Press Association* case, Justice Brennan noted that there

25  can't be any prohibitions on publication by the press of

1   any information pertaining to pending judicial

2   proceedings or any operation of the criminal justice

3   system no matter how shabby the means by which the

4   information is obtained.

5          Now, I'm not -- I do not agree with any

6   characterization that I purposely took advantage of

7   Mr. Wilkison's supposed naivete or trust or whatever, nor

8   that I worked with Mr. Wilson to conspire to obtain

9   something that I -- that I or he had been unsuccessful in

10  obtaining.  I don't agree with that characterization.

11  But let's suppose for a minute I did that.  Let's suppose

12  I tackled Mr. Wilkison in the hallway, grabbed his

13  briefcase, yanked the grand jury transcript out of the

14  briefcase, raced down and published it.

15         Well, I broke a lot of laws in doing that

16  kind of activity.  But as I read the *Nebraska Press*

17  *Association vs. Stewart* case, no matter how shabby the

18  means by which the information is obtained, the

19  government can charge me with all those criminal

20  violations for tackling Mr. Wilkison and grabbing the

21  grand jury transcript and publishing it, if they believe

22  that's a criminal act also, but to prevent me from

23  publishing it, I don't believe they can do that.

24         And though I failed, apparently, to mention

25  the *Connections Distribution* case, counsel for the

1  plaintiff has also brought up some cases that she failed
2  to bring with her or reference earlier.  I think it's
3  controlling law.  It says, "Any even limited deprivation
4  of civil rights" -- in this case, it was a First
5  Amendment case -- "causes irreparable harm to the party
6  whose rights have been deprived or limited."  I don't see
7  that the County has -- so the U.S. Supreme Court is
8  saying, if I'm inhibited from publishing, my rights have
9  been infringed upon.

10         But the County also only speculated --
11  aside from the 100 hours of time that they've spent
12  fighting the case that they brought, they're only
13  speculating that this is going to cause them any
14  significant harm, if any harm at all.

15         I -- again, frankly, I won't dispute that
16  maybe it would be slightly more difficult to find 16
17  jurors.  There might even be somebody who'd say, "Gosh, I
18  don't want to do this because I don't want to see my name
19  in print like it was before."  But, you know, in most
20  communities, court cases are reported on all the time,
21  and far more than one in ten persons in a community would
22  have knowledge of some -- or could have -- excuse me --
23  could have basic knowledge of the facts of some case from
24  pretrial hearings and police reports that are reported
25  on.

1          So the fact that it could happen, the fact
2   that 10,000 or 100,000 people might have access to this,
3   I don't know that that is the kind of provable or even
4   reasonably possible harm that could outweigh already
5   what's established harm when you infringe the right of
6   the press to report on judicial proceedings.

7          Just a minor thing.  Counsel for the
8   plaintiff referred to a right to violate a law.  I don't
9   know that there is such a right.  I think perhaps there's
10  an ability to violate a law; I don't think there is a
11  right to violate any law.

12         If the -- if the law is constitutional and
13  including the question of if disclosed really intends to
14  be applied to every single person who potentially has
15  access to this because there's a link available to them
16  somewhere, then perhaps I've, in fact, committed a
17  criminal violation of that.  I don't agree with the other
18  two.  I don't see they are criminal cases.  I mean the
19  other two laws that are cited in the complaint.

20         But even if I committed a criminal
21  violation of that, I don't believe that the State is
22  entitled to at this point -- I'm sorry -- the County is
23  entitled at this point to a preliminary injunction, and
24  I'm absolutely certain that you cannot craft a future
25  prohibition on publishing.

1                    That's all I have.

2                    THE COURT:  Thank you, Mr. Morgan.

3                    Did you have some -- I think you are taking

4    some notes.  I assume you have some rebuttal.

5                    MS. RANSOM:  Yes, very brief.

6                    THE COURT:  Sure.  Of course.

7                    MS. RANSOM:  Yes, Your Honor.

8                    There is no prior restraint where there is

9    no right to prior access.  That is what the Arizona

10   Supreme Court and the United States Supreme Court have

11   said for 40-plus years.

12                   And that is why this law is constitutional,

13   is because the grand jury secrecy statutes and the First

14   Amendment have coexisted for more than 200 years.  And

15   they're both constitutional, and they both have been

16   ratified as such on a multitude of occasions.  The

17   probability of harm is what we needed to establish, not

18   actual harm, the probability of harm, that Mr. Morgan has

19   done us a favor of acknowledging actual harm just a

20   moment ago, indicating that it might be a bit more

21   difficult to find jurors.

22                   This is a first-degree homicide case.

23   Impaneling jurors, that's a very significant deal.

24   Having his conduct making it harder is harmful to the

25   County Attorney's Office.

1          And on the prior restraint point, even when
2   you have a prior restraint, even if you don't necessarily
3   agree with me that that's not in play under every single
4   circumstance, as the Arizona Supreme Court -- not Supreme
5   Court -- the Court of Appeals said in the *KPNX* case and
6   the case law that I cited to you was in all of the briefs
7   today, other than the Stooks opinion that came up on
8   February 20th by the defendant, the First Amendment
9   rights are not absolute.  Even when you have a prior
10  restraint situation, Your Honor is not without authority
11  or power to craft the least onerous protection when
12  you're dealing with these competing interests.
13  Mr. Morgan does not get to just walk in and say, "First
14  Amendment" and then flagrantly violate the law and invite
15  everyone to come along with him.

16          That is what he is, in fact, doing.  And
17  that is the problem, and that's why we are here today,
18  and that's why we need the relief that we've asked for.

19          Removing the hyperlink.  Your Honor, the
20  reason we asked in our order very specifically to remove
21  hyperlinks, because Mr. McIntyre is far more tech savvy
22  than myself, is because we understand the removal of that
23  would deprive access.  Even if the website is still up,
24  if Your Honor orders removal of the hyperlink, then
25  clicking on it will not take us to the document anymore

1   and will prevent the issue of hundreds of thousands

2   people gaining access to these materials and violating

3   the statute in the future.

4           So, Your Honor, the County has met its

5   burden.  It has amply met its burden.  It is seeking

6   narrow relief.  And we do ask for the February 15th order

7   to be entered or, in the alternative, the TRO.  To the

8   extent Your Honor would like a more detailed ruling, we

9   will get that to you, the proposed findings.

10          THE COURT:  Thank you, Ms. Ransom.

11          First, I'm going to rule from the bench.  I

12  want to thank Ms. Ransom on behalf of the County for a

13  very professionally presented case on the County's behalf

14  and very thorough work in representing the issues and the

15  authorities.

16          Mr. Morgan, I wanted to compliment you on

17  your presentation and how well-prepared you are and how

18  thoughtful your arguments have been to the Court.

19          So this matter was well-presented to the

20  Court.

21          In this particular matter, the County, as

22  plaintiff, alleges that the defendant manages and

23  controls the content of the Facebook website, Cochise

24  County Record.  This is publicly available and

25  accessible.  The County further alleges that the